UNITED STATES, Appellee,

v.

Otis B. HARRIS, Jr., Private, U.S. Army, Appellant.

No. 47149.

SPCM 17338.

U.S. Court of Military Appeals.

April 8, 1985.

For Appellant: *Captain Harry L. Williams, Jr.* (argued); *Colonel William G. Eckhardt* and *Lieutenant Colonel William P. Heaston* (on brief); *Captain Kenneth G. Gale.*

For Appellee: *Captain Edmond R. McCarthy, Jr.* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Major Patrick M. Flachs, Captain Daniel N. Velling* (on brief); *Lieutenant Colonel John T. Edwards.*

*Opinion*

EVERETT, Chief Judge:

Tried by special court-martial on October 20, 1981, appellant was convicted, despite his pleas, of wrongfully possessing and selling marihuana [1] and, pursuant to his pleas, of unlawfully striking a fellow soldier about the head with his fists, in violation of Articles 134 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 934 and 928, respectively. The adjudged and approved sentence extends to a bad-conduct discharge, confinement at hard labor for 6 months, reduction to Private (E–1), forfeiture of $100.00 pay per month for 6 months, and a fine of $1,500.00. The findings and sentence were affirmed by the United States Army Court of Military Review over Judge O'Donnell's partial dissent. 16 M.J. 562 (1983).

We granted review on these two issues:

I

WHETHER THE MILITARY JUDGE ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS APPEL-

1. Appellant was also charged with wrongfully introducing marihuana onto a military post for the purposes of use, transfer, and sale. However, the military judge granted a motion for a finding of not guilty as to that specification.

LANT'S PRETRIAL STATEMENT OBTAINED DURING CUSTODIAL INTERROGATION AFTER APPELLANT'S REQUEST FOR AN ATTORNEY HAD BEEN IGNORED.

## II

WHETHER APPELLANT'S SENTENCE BY A SPECIAL COURT–MARTIAL TO A FINE AND FORFEITURES IS UNLAWFUL.

We shall discuss them in reverse order.

### The Fine

■ Article 19 of the Uniform Code, 10 U.S.C. § 819, sets limitations on certain punishments that may be imposed by a special court-martial; otherwise, that court-martial "may ... adjudge any punishment not forbidden by this chapter." Fines are not among the punishments enumerated, but forfeitures are expressly limited to two-thirds of an accused's pay per month for 6 months. A fine is distinct from a forfeiture in that

a forfeiture deprives the accused of all or part of his pay only as it accrues, [but] a fine, when ordered executed, is in the nature of a judgment and makes him immediately liable to the United States for the entire amount of money specified in the sentence ...

In order to enforce collection, a fine may be accompanied by a provision in the sentence that, in the event the fine is not paid, the person fined shall, in addition to any period of confinement adjudged, be further confined until a fixed period considered an equivalent punishment to the fine has expired.

*Para.* 126*h*(3), Manual for Courts-Martial, United States, 1969 (Revised edition).

Furthermore, the Manual for Courts-Martial states:

All courts-martial have the power to adjudge fines instead of forfeitures in cases involving members of the armed forces. General courts-martial have the further power to adjudge fines in addition to forfeitures in appropriate cases. See Section B, 127*c*. Special and summary courts-martial may not adjudge any fine in excess of the total amount of forfeitures which may be adjudged in a case.

*Para.* 126*h*(3), Manual, *supra.*

In *United States v. Sears*, 18 M.J. 190 (C.M.A. 1984), appellate defense counsel contended that the Manual provision authorizing special and summary courts-martial to adjudge fines was invalid, because it allowed these courts to impose punishments that were not within the jurisdictional limitations established for them by the Uniform Code. According to this argument, even though the amount of a fine adjudged by a special or summary court-martial could by the Manual provision be no greater than that of the forfeitures it could impose, the difference in the methods for collecting fines and forfeitures is so significant that, if Congress had intended that inferior courts-martial could impose fines, this authority would have been granted expressly in the Code. *Sears* rejected this argument, and the Court upheld the Manual provision.

In the present case, Harris argues that the sentence adjudged was precluded by the Manual, rather than by the Code. He contends that the specific authority granted general courts-martial "to adjudge fines in *addition to forfeitures* in appropriate cases" (para. 126*h* (3), Manual, *supra* (emphasis added)) signifies, by negative implication, that special and summary courts-martial lack this power to adjudge forfeitures and a fine in the same sentence.

The first answer to this contention is that it leads to an illogical result which the President would never have intended. If he was willing to allow special and summary courts to adjudge fines up to the amount of the forfeitures imposable, no reason would exist for him to prohibit the combination of forfeitures with a fine. Secondly, it is clear from the context that, in discussing the power to adjudge fines "in addition to forfeitures," the Manual referred to the

limitations imposed by the Table of Maximum Punishments; *see* para. 127*c*. The Manual intended to allow a general court-martial to impose a fine in an appropriate case even though the combination of the fine and the forfeitures exceeded the amount of forfeitures that could be adjudged by court-martial for these offenses. Of course, no power of this sort was conferred on special and summary courts-martial. For these reasons, issue II is without merit.

*Admissibility of the Pretrial Statement*

A

During a health-and-welfare inspection on July 8, 1981, appellant's platoon leader, Lieutenant Robert Mangiamele, found a box containing marihuana in the room occupied by appellant and two others. Mangiamele told appellant "to shut up and stand at ease," and then he directed the first sergeant to call the military police. In response to this call, Specialist Four William W. Griffith, a military policeman, arrived on the scene and advised appellant that "he was under detention and he should accompany me to the first sergeant's office." After they arrived there, Griffith "apprehended" Harris and "advised him of his rights by the rights card." Thereupon, appellant "stated ... that he wished a lawyer."

Griffith "determined that due to the quantity of contraband found, that the Criminal Investigation Division should be notified" and "advised the MP desk sergeant of same. He agreed and therefore notified the Criminal Investigation Division." In response to a question on cross-examination, Griffith acknowledged that when drugs were found in the quantity that had been present in appellant's room, the military police "would work with the MPI and the CID," so that they became "one law enforcement agency working together." Sergeant Griffith did "not recall" whether he had informed the Criminal Investigation Division of appellant's request for a lawyer; but he had not tried himself to call for an attorney for appellant.

Lieutenant Mangiamele testified that he had been present when the military policeman read appellant "his rights and he said, 'Do you want to answer questions?' and Harris said no; then he asked him if he wanted to see a lawyer and Harris said yes." The lieutenant had been about six feet from appellant when he asked for a lawyer. A short time later Mangiamele wrote a statement which, among other things, recited that Specialist Four Griffith "read E–2 Harris, Otis, his rights. E–2 Harris, Otis, said he understood his rights and did not want to answer any questions and wanted to see a lawyer." Mangiamele's statement, handwritten on a DA Form 2823, was subscribed and sworn to before Griffith at that same time.

Because of the discovery of the marihuana in appellant's room, Corporal Nelson Ortiz, a drug investigator from the Joint Drug Suppression Team of the Criminal Investigation Division, Hanau, went to the office of appellant's first sergeant. There he found appellant under apprehension; and also he noted that the military police "were taking some statements from the platoon leader." Ortiz did not talk to appellant; but, according to the Investigator's Statement which Ortiz prepared on DA Form 2823, he and Special Agent Edwards of the CID "were informed by the MPs of what they had. We obtained written statements from the unit first sergeant, platoon leader, and unit commander." Ortiz explained that the statements to which he had referred in this document were those "that were being taken at the time we got there." According to Ortiz, the agent who took over the case would normally review the paperwork; but in this instance he did not know whether the statements that had been taken by the military police had been brought back to the CID office by that time.

Appellant was taken to the CID office. There he was interviewed by Sergeant Richard R. Finch, an experienced military police investigator, who was "attached to the Drug Suppression Team with the Hanau Resident Agency Criminal Investiga-

tion Command." Finch had not gone to appellant's unit, but he had been "informed by another agent that an incident had occurred" there "and that other members of our Team were taking statements at that location." According to Finch,

Specialist Griffith, the military policeman who initially responded to the case, contacted me and stated he was unsure whether it was a CID offense in the purview of investigating it or the MPs. He had received the evidence from the Commander. We took the evidence and weighed the evidence, and it fell within the CID purview. At that time I received the evidence from Specialist Griffith and receipted for it, and sealed it in a sealed container.

Thereafter, Ortiz contacted Finch; and they "escorted Private Harris to our interview room at the CID office," where Finch "advised him of his rights." For this purpose he used DA Form 3881, which is a Rights Warning Procedure/Waiver Certificate. After being read his rights, appellant acknowledged that he "understood" them; and he executed the waiver with Finch and Ortiz as witnesses. Harris never requested to see an attorney or to stop the questioning; and Finch was unaware of the earlier request for counsel. According to Finch, he had "specifically asked" appellant "if he had been advised of his rights by the military police"; and Harris responded in the negative. Finch also testified that if appellant had said yes, "I would have gone to whichever military policeman advised him of his rights and gotten that Rights Waiver Certificate."

In his Investigator's Statement, Ortiz had noted that "MPI Finch started his interview at which time MPI Finch was not getting any results so I requested SA RUBIO to assist us in the interview." Ortiz testified that he had been referring in this statement to "the fact that it appeared to me that Otis [appellant] didn't like Mr. Finch's tactical line of questioning, so he kept looking out the window and he kept ignoring Mr. Finch, so I asked Mr. Rubio if he would come in." In Ortiz' view, Rubio

was "more experienced" and "more professional" than Finch.

Rubio testified that he had been a CID agent for 13 years and was currently "the operations officer of the CID office" in Hanau. At one time he had "run the Drug Suppression Team." Rubio also explained that while "[o]nly one CID agent runs the Drug Suppression Team," some military police investigators are "[a]ttached to the CID to work with Drug Suppression Team." On July 8, 1981, members of the team had requested assistance in interviewing appellant. According to Rubio, "they called me and they told me that the man was talking, but they wanted me to interview him to see if he wouldn't tell me." This request for Rubio's assistance was made about an hour and a half after Finch had commenced his interview with appellant and some four and a half hours after appellant had been apprehended by Griffith.

After ascertaining that appellant had been advised of his rights by Finch and Ortiz, Rubio started his own interview. Ultimately, Harris "admitted that he was the owner of the marihuana found" in his room "during the health and welfare inspection"; and Harris also described where he had bought the marihuana and what he had done with it. However, appellant declined to reduce his oral admissions to a written statement. Rubio had only asked appellant "if he had been advised of his rights by Ortiz" and "did not inquire how many times he might have been advised of his rights previously." He was unaware of any previous request by appellant for an attorney.

During the out-of-court hearing as to the admissibility of appellant's remarks to Special Agent Rubio, Harris testified that, when he was apprehended, a military policeman "pulled out a card and read me my rights"; and he had requested a lawyer. Later, Finch had read him his rights from a certificate. According to Harris, he then told Finch that he wanted a lawyer present, although he admitted that his signature was on the waiver certificate. When

asked, "[W]hy did you sign a document that says that you do not want a lawyer present?", his only reply was, "No comment, sir."

After extensive argument, the military judge denied the defense request to suppress appellant's statements and all evidence resulting therefrom. He stated:

The court finds that shortly after his apprehension at the scene of the criminal conduct, the accused was warned by a military policeman from a rights warning card concerning his rights, including the right to counsel, and at that time requested counsel, stating that he didn't want to say anything. The court further finds that later that morning, approximately two to three hours later, while still under military custody, he was brought into a CID interview room and interviewed by Sergeant Finch, who was unaware of the prior warning and request for counsel. After a full explanation of his rights, the accused waived his rights to remain silent and have counsel present, and signed the DA Form 3881 indicating his desires.

The court further finds that unlike *United States versus Simmons* found at 11 MJ 515, a Navy Court of Military Review case, 1981, this court holds that these facts cannot be considered a seriatim issue of warnings by interrogators. We find that the initial rights warning by the military policeman was informationary in nature and that the subsequent formal waiver did not wear down the accused or add to his frustration concerning any lack of counsel. On the contrary, we find the accused to be able to understand his rights, mature in judgment, and when asked by Mr. Finch whether he had been warned prior, he indicated he had not. We believe that by his actions then and in court today, the accused indicated his understanding of his rights, and attempted to use them to his advantage. We find the accused made a knowing and voluntary waiver of his rights when given a formal and proper explanation of his rights by Sergeant Finch.

B

Article 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831, established a warning requirement for military interrogations—whether custodial or noncustodial. However, the statutory warning does not include any reference to a suspect's right to counsel; and so far as the Code itself is concerned, servicemembers are granted no right to demand the presence of counsel if they are interrogated prior to the filing of charges. *United States v. Moore*, 4 U.S.C.M.A. 482, 16 C.M.R. 56 (1954).

In 1966, the United States Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 set forth the following constitutional doctrine:

[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination .... Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. *If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.* Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

(Emphasis added.)

Although the Court cited Article 31 of the Uniform Code to support its holding,[2] the requirements of *Miranda* are quite different from those imposed by Article 31. Unlike Article 31, *Miranda* applies *only* to custodial interrogations, and the warning need not include advising the person questioned as to the crime of which he is suspected. On the other hand, *Miranda* demands that the suspect be advised that he has a right to the presence of counsel and that counsel will be provided him if he is indigent—rights not extended by Article 31.

In *United States v. Tempia*, 16 U.S.C. M.A. 629, 37 C.M.R. 249 (1967), this Court ruled that *Miranda* applies to military interrogations. The premise for this holding was that servicemembers enjoy the same constitutional rights as other citizens, unless those rights are expressly or by necessary implication inapplicable to persons in the armed forces.

When the President promulgated the Military Rules of Evidence in 1980,[3] Mil.R. Evid. 305(d) incorporated the *Miranda* requirement with respect to custodial interrogations of military personnel. Mil.R.Evid. 305(d)(2) specifically provided at the time of this trial:

> When a person entitled to counsel under this rule requests counsel, a judge advocate or law specialist within the meaning of Article 1 or an individual certified in accordance with Article 27(b) shall be provided by the United States at no expense to the person and without regard to the person's indigency or lack thereof before the interrogation may proceed
> . . . .

Indeed, as the Draftsmen's Analysis of the Rule, Appendix 18, Manual, *supra*, makes clear, this right to counsel is broader than that granted by *Miranda*, for military counsel are to be furnished without regard to the indigency or lack thereof on the part of the person being interrogated. However, just as *Miranda* allowed waiver of the rights which it granted, Mil.R.Evid. 305 authorizes waiver of the right to counsel and the other rights provided by that Rule. Mil.R.Evid. 305(g).

In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed. 2d 313 (1975), the Supreme Court held that a confession was admissible even though it had been made only a few hours after the defendant had been warned of his *Miranda* rights and had requested to remain silent. Although the opinion specifically noted that *Miranda* distinguished between the procedural safeguards triggered by a request for counsel and by a request to remain silent, "much of the logic and language of the opinion could be applied to the invocation of the former." *Solem v. Stumes*, —— U.S. ——, 104 S.Ct. 1338, 1344, 79 L.Ed. 2d 579, 590 (1984). Consequently, it was "unsettled" whether law enforcement "authorities could resume questioning after a defendant ha[d] asked for an attorney." *Id.*; *see also United States v. Hernandez*, 574 F.2d 1362, 1370 n.16 (5th Cir. 1978); *United States v. Herman*, 544 F.2d 791, 796 n.8 (5th Cir. 1977).[4]

In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court settled that basic question. There, the Court considered admissibility of a confession obtained from the defendant in a second custodial investigative interrogation the day after his initial interrogation at which he had been advised of his *Miranda* rights and had invoked his right to counsel. In an opinion by Justice White, the Court held

> that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation

2. 384 U.S. 436, 489, 86 S.Ct. 1602, 1635, 16 L.Ed.2d 694.

3. *See* Exec. Order No. 12,198, March 12, 1980.

4. The extent of the uncertainty as to this issue was a principal point of contention between the majority and the dissenters in *Solem v. Stumes*, —— U.S. ——, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), which concerned the retroactive effect to be given *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed. 2d 378 (1981).

even if he has been advised of his rights. *We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.*

*Id.* at 484–85, 101 S.Ct. at 1884–85 (emphasis added; footnote omitted).

As Justice White explained, *"Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.'" Moreover, *Michigan v. Mosley, supra,* had recognized the distinction between "a request to remain silent and a request for an attorney," *id.* at 485, 101 S.Ct. at 1885; and *Fare v. Michael C.,* 442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L. Ed.2d 197 (1979), had "referred to *Miranda's* 'rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease.'" 451 U.S. at 485, 101 S.Ct. at 1885.

In *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the plurality opinion by Justice Rehnquist reaffirmed the *Edwards* principle that once "an accused ... [has] expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 103 S.Ct. at 2834, quoting from 451 U.S. at 484–85, 101 S.Ct. at 1885. Justice Rehnquist concluded, however, that the defendant's inquiry—"Well, what is going to happen to me now?"—" 'initiated' further conversation." 103 S.Ct. at 2835.

Justice Marshall's dissent in *Bradshaw,* joined by three other Justices, fully accepted the premise that an accused who has requested counsel may not be interrogated in the absence of counsel, unless he has "initiated" a further discussion with the police. The dissenters reasoned that Bradshaw's question did not constitute "initiation" of a generalized discussion of the criminal offense under investigation.

In *Solem v. Stumes, supra,* the Supreme Court declined to apply *Edwards* retroactively in a habeas corpus proceeding wherein a 1973 conviction was being collaterally attacked. Writing for the majority, Justice White explained that *"Edwards* did not confer a substantive constitutional right that had not existed before; it 'created a protective umbrella serving to enhance a constitutional guarantee.'" 104 S.Ct. at 1342 n. 4. In concluding that a reliance interest was present which tended to preclude the retroactive application of *Edwards,* Justice White emphasized:

*Edwards* established a bright-line ·rule to safeguard pre-existing rights, not a new substantive requirement. Before and after *Edwards* a suspect had a right to the presence of a lawyer, and could waive that right. *Edwards established a new test for when that waiver would be acceptable once the suspect had invoked his right to counsel: the suspect had to initiate subsequent communication . . . .*

*Edwards* nonetheless did establish a new rule. We do not think that the police can be faulted if they did not anticipate its *per se* approach . . . .

*Id.* at 1343.

It would be unreasonable to expect law enforcement authorities to have conducted themselves in accordance with its bright line rule prior to its announcement ... [5]

*Id.* at 1345 (emphasis added).

### C

Since the Supreme Court has ruled in *Solem v. Stumes, supra,* that *Edwards*

---

**5.** The dissenting Justices concluded that *Edwards* was applicable because it only reaffirmed

a principle that had been articulated by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16

added a new rule which goes beyond *Miranda,* the holding in *United States v. Tempia, supra,* does not directly govern the case at bar. However, the *Tempia* rationale clearly applies, for we perceive no reason why military personnel are either expressly or implicitly excluded from the benefit of this right which the Supreme Court held in *Edwards* had been granted by the Fifth Amendment.[6] Moreover, it would be confusing to apply *Miranda* to military interrogations and not to apply *Edwards.* Finally, we are unaware of any military exigency which might have led to an intent of the President that the waiver provisions of Mil.R.Evid. 305(g) be applied in a way that would produce a result less favorable to an accused than would be reached in a Federal District Court under *Edwards v. Arizona, supra.*

### D

█ The military judge found that, after appellant had been "warned by a military policeman from a rights warning card concerning his rights, including the right to counsel," he "at that time requested counsel, stating that he didn't want to say anything." Nonetheless, "while still under military custody, he was brought into a CID interview room and interviewed by Sergeant Finch." Bringing Harris in for an interview without honoring his request for the counsel to which he was entitled would appear to have violated Mil.R.Evid. 305(d)(2)'s direction that interrogation should not proceed under such circumstances. This rule had taken effect some ten

months before Harris was interrogated; and, if applicable, it should have been followed. Furthermore, under *Edwards* —which was decided some six weeks before—Finch and Rubio apparently were not free to interview Harris after his request for counsel unless he "initiated" a discussion with them.

Appellate government counsel seek in various ways to distinguish the present case from the situations contemplated by Mil.R.Evid. 305(d)(2) and by *Edwards.* For one thing, they point out that Finch and Rubio were personally unaware of appellant's prior request for counsel. However, a number of courts have held that *Edwards* applies even though the interrogator knew nothing about the previous request for counsel and was acting in good faith.[7] *See, e.g., United States v. Scalf,* 708 F.2d 1540, 1544 (10th Cir. 1983); *White v. Finkbeiner,* 687 F.2d 885, 887 n.9 (7th Cir. 1982) (hereafter cited as *White III), judg. vacated,* —— U.S. ——, 104 S.Ct. 1433, 79 L.Ed.2d 756 (1984); *United States v. Downing,* 665 F.2d 404 (1st Cir. 1981). With respect to the opinion of the Seventh Circuit in *White v. Finkbeiner, supra,* the Court of Appeals stated in *Scalf:*

> On remand, [from the Supreme Court], the Seventh Circuit concluded that under *Edwards,* the fact that the investigating officers were unaware of White's earlier request for counsel was irrelevant, and the confession should have been suppressed. *White III, supra,* at 887–88 & n.9. Other courts have reached the same

L.Ed.2d 694, in 1966 and had been recognized in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)— precedents on which the majority had relied in *Edwards v. Arizona, supra.* Accordingly, in their view retroactive application was mandated by *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), which had retroactively applied *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (warrant required for arrest of suspect in his residence).

**6.** Even though in *United States v. Goodson,* 18 M.J. 243 (C.M.A. 1984), *pet. cert. pending,* a

majority of the Court concluded that *Edwards* did not apply to that factual situation, there was no contention that *Edwards* is inapplicable to military interrogations.

**7.** In *United States v. Goodson, supra,* the interrogator was unaware of an earlier request for counsel made by the accused; and this Court, by divided vote, declined to apply *Edwards v. Arizona, supra.* However, in the case at bar, appellant made his request for counsel after receiving a warning of his *Miranda* rights—the event which in the view of the *Goodson* majority was essential for invocation of *Edwards.*

conclusion. *Karr v. Wolff*, 556 F.Supp. 760, 765 (N.D.Ill. 1983) (dictum); *U.S. v. Lilla*, 534 F.Supp. 1247, 1280 (N.D.N.Y. 1982); *Louisiana v. Arceneaux*, 425 So.2d 740, 744 (La. 1983); *see also U.S. ex rel. Kimes v. Greer*, 527 F.Supp. 307, 310 (N.D. Ill. 1981) (good faith of officer who questioned suspect after request for counsel is irrelevant). We believe this to be a correct statement of the law.

708 F.2d at 1544.

The Government also calls our attention to the fact that Griffith was only a military policeman, rather than a military police investigator like Finch or a CID Special Agent like Rubio. However, apparently all of these persons were part of the Joint Drug Suppression Team. Moreover, *Edwards* has been applied even when the request for counsel was made to someone of a police agency entirely different from that of the interrogator. For example, in excluding evidence in *Scalf*, where the request for an attorney had been directed to a state patrolman and not to the FBI agents who later conducted the interrogation, the Court of Appeals observed: "To state the rule affirmatively, once a suspect has invoked the right to counsel, knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect." *Id*. at 1544. In *Downing*, where state police had failed to advise a federal customs officer of defendant's request for counsel, the Court of Appeals excluded the evidentiary fruit of defendant's statements to the federal official. The Court explained:

> To allow officers to do sequentially what would, if done at or near the same time and place, be impermissible conduct would encourage circumvention of the safeguard. Law enforcement officers working in teams should be discouraged from violating the accused's constitutional rights by failing to ascertain or advise one another whether those rights had been previously asserted. The official conduct was at least "negligent" and we conclude that the purposes of the exclu-

sionary rule would be furthered by suppressing the fruits here.

665 F.2d at 407–08 (footnote omitted).

Even though Griffith, who originally apprehended appellant, appears to have been only a military policeman, rather than a military police investigator, he was acting as a member of the Drug Suppression Team; so there would seem to be some basis for imputing his knowledge of appellant's request for counsel to Finch and to Rubio, just as in *Scalf* the state police officer's knowledge was imputed to the FBI agent.

Furthermore, Griffith had obtained from Lieutenant Mangiamele, appellant's platoon leader, a written statement which referred specifically to appellant's request for counsel. For obvious reasons, the normal procedure under these circumstances was for statements taken by military policemen at the scene of a suspected crime to be delivered to the person conducting the investigation thereafter. In his Investigator's Statement, Ortiz states: "We obtained written statements from the unit first sergeant, platoon leader, and unit commander. The evidence was transported to Hanau JDST office where it was turned over to MPI Finch, and prepared for laboratory." For some unexplained reason, Finch was unaware of appellant's request for counsel even though it was specifically mentioned in a statement which should have been in his possession. Therefore, we do not know whether Finch's claimed ignorance of appellant's request for counsel was as "negligent" as the failure in *Downing* or, instead, resulted from some unforeseeable mishap.

The Government relies especially on Finch's testimony that appellant had answered in the negative when asked "if he had [already] been advised of his rights by the military police." Apparently, the military judge considered this response to be significant evidence of appellant's desire to waive the right to counsel which he had previously requested. However, if Finch had actual or constructive knowledge of the request, then he should never have

brought Harris to the interview room before providing him with a lawyer. In that event, the request for counsel should not be vitiated by a conversation which should not have taken place after the request had been made.

Furthermore, Finch's testimony about appellant's negative answer to his question is consistent with the possibility that Harris misunderstood the question asked or that Finch misunderstood the reply. According to Finch, he asked Harris whether he had been advised of his rights by the "military police"; and Finch testified that, if he had received an affirmative answer, he would have looked for the waiver certificate that had been prepared. Apparently, Finch assumed that, if appellant had already been advised of his rights by the "military police," this advice would have been given with the aid of a waiver certificate like that which Finch employed. However, Griffith used a "card," rather than a certificate, to advise appellant of his rights.

It appears quite plausible that appellant believed that Finch was asking him if he had been warned of his rights by a military police investigator. In that event, the negative answer was correct, for Harris had been warned by a military policeman, rather than an investigator. On the other hand, appellant may have believed that Finch's question was whether he had been advised of his rights from a "certificate," like that employed by Finch; and once again a negative answer would have been correct, because Griffith used a "card."

The very existence of these possibilities for misunderstanding leads to an understanding of the basic reason why—as the Supreme Court emphasized in *Solem v. Stumes, supra*—its opinion in *Edwards*

was intended to establish a new "bright-line rule." The advantage of such a rule is certainty of result and elimination of issues to be litigated.[8] Thus, perhaps the Court intends for this rule to apply literally whenever a request for counsel has been made—even though the investigators have acted in good faith and with no negligence. In that event, the rule would exclude even statements made during an interrogation by an investigator unaware that previously the suspect had been interviewed by another investigator who died immediately after a request had been made for counsel.

However, before determining whether the rule in *Edwards* was intended to be pressed to its outer limits,[9] we believe that a more complete record should exist as to the actions of Griffith, Finch, and others. For this purpose a *DuBay*[10] hearing seems in order here—just as in *United States v. Vietor*, 10 M.J. 69 (C.M.A. 1980), and *United States v. Killebrew*, 9 M.J. 154 (C.M.A. 1980).

## E

Accordingly, the decision of the United States Army Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Army for transmission to an appropriate general court-martial convening authority who will refer the record to a general court-martial military judge for the purpose of conducting an evidentiary hearing. At this hearing, the judge will take evidence, make findings of fact, and enter conclusions of law with respect to these questions:

1. What statements, if any, were taken by Sergeant Griffith as part of his investigation?

---

8. In order to eliminate confusion and uncertainty, the Supreme Court also recently established a "bright-line rule" concerning the permissible scope of automobile searches, when it held in *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), that an otherwise lawful automobile search could include the contents of containers of any type that might be located anywhere in the car. Similarly in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the Court announced the

rule that the passenger compartment of an automobile may be searched incident to the lawful arrest of an occupant.

9. In *New York v. Quarles,* —— U.S. ——, 104 S.Ct. 2626, 2632, 81 L.Ed.2d 550 (1984), the Supreme Court, by divided vote, created "a 'public safety' exception to the" *Miranda* rule.

10. *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

2. How frequently and under what circumstances has Sergeant Griffith taken statements as part of his military police duties?

3. For what purpose and under what circumstances did Sergeant Griffith warn appellant of his rights?

4. What, if anything, did Sergeant Griffith advise appellant as to the offenses of which he was suspected?

5. What are the contents and DA Form number, if any, of the card used by Sergeant Griffith to advise appellant, and under what circumstances did he customarily use this card?

6. Is Sergeant Griffith familiar with DA Form 3881, and under what circumstances, if any, has he used this Form in the performance of his duties?

7. Who else accompanied Sergeant Griffith to appellant's unit, and what was done by these persons?

8. What reports were made by Sergeant Griffith or others concerning the investigation at appellant's unit; and to whom and when were these reports made?

9. What was the disposition of the statements made by Lieutenant Mangiamele and to whom and when was this statement transmitted?

10. Whom, if anyone, did Sergeant Griffith inform of appellant's request for counsel and who was present when this request was made?

11. Why did Sergeant Griffith not inform military police investigators of appellant's request for counsel?

12. At the time of his investigation, what was the relationship of Sergeant Griffith to (a) Corporal Ortiz; (b) Sergeant Finch; (c) Special Agent Edwards; (d) Special Agent Rubio; and (e) the Joint Drug Suppression Team?

13. Were there any directives or policies in effect which required Sergeant Griffith to warn appellant of his rights; and if so, what were those directives and policies?

14. What was the standard procedure, if any, followed by Sergeant Griffith in reporting the results of any drug investigations he made?

15. To whom did Sergeant Finch talk before interviewing Sergeant Griffith, and what information did he receive from such conversations?

16. When did Sergeant Finch first learn that written statements had been taken at appellant's unit, and when did he first see these statements?

17. What was the exact language used by Sergeant Finch in inquiring of appellant whether he had previously been advised of his rights, and what was the language used by appellant in response to this inquiry?

At the conclusion of the hearing on these matters, the judge will enter his findings of fact and conclusions of law, and return the record and verbatim transcript directly to this Court. If the general court-martial convening authority to which this record is transmitted believes a limited hearing is impracticable, he will dismiss the charges or order a rehearing at which appellant's oral statements to Special Agent Rubio will not be received in evidence.

Judge FLETCHER did not participate.

COX, Judge (concurring in the result):

I concur in the disposition of Issue II.

Regarding Issue I, I recognize that the United States Supreme Court intended for *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), to establish a bright-line rule. *Smith v. Illinois*, ___ U.S. ___, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984); *Solem v. Stumes*, ___ U.S. ___, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984). The necessity for such a bright-line prohibition is to prevent "the authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—... [to] otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Smith v. Illinois, supra*, 105 S.Ct. at 494–95. This rule should likewise be applied under the Uniform Code of Military Jus-

tice. *United States v. Goodson*, 18 M.J. 243 (C.M.A.1984); *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). It is uncontradicted in this case that appellant unambiguously requested an attorney, did not have the opportunity to talk with an attorney, and did not "initiate" the interrogation resulting in his confession.

I am unwilling, however, to make the bright-line of *Edwards* so intense that if any accused makes a request for counsel to any government agent, anywhere or at anytime,[1] then no other government agent can ever talk to that accused unless the accused himself initiates the conversation.[2] In my view, the realities of military life preclude such inflexibility.[3]

While I agree that there is a bright-line rule, I just want to be certain we recognize that when we bind a government agent to

the rule, we must determine if the agent had the ability to see the bright line. That is to say, did the agent know, or, by exercising due diligence, could he have learned, that the accused had requested an attorney? The novel question presented here is: How does a government agent find out if an accused has requested an attorney?

The singular facts of this particular case distinguish it from the line of decisions that begins with *Edwards v. Arizona, supra*. The first policeman on the scene, Griffith, did not interrogate the accused in a *Miranda*[4] setting, and the advisement of rights he gave accused apparently was for some purpose other than "custodial interrogation." The record does not establish that Griffith informed either CID agent, Finch or Rubio, of the accused's request for counsel, and it appears that they were not aware of that request. Thus, I must ask by what means were these CID interroga-

---

1. The term "government agent" is intended here as a term of art to include anyone defined by *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), and its progeny as being required to give a warning under Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831, prior to interrogation.

2. It takes little imagination to visualize situations where the inflexibility of such a rule would work absurd results. For example, suppose a suspect who had been apprehended, read his rights, and requested an attorney, then wrestled the apprehending officer's weapon away, shot him, and fled. Upon his subsequent apprehension by other officers, a new advisement of rights would not permit interrogation about the original crime since there would be no way of knowing of the earlier request for counsel until the original officer could be questioned. It would seem reasonable to interpret the initial advisement of rights as being a preliminary stage of the process and consider as controlling only the advisement made immediately prior to interrogation. In the example given, no amount of diligence by the second officers would uncover the fact of the earlier request except to ask the accused whether or not he had received an advisement of rights and, if so, what elections he had made at that earlier time. If my premise is correct, then it would be the state of mind of the second officers that would be determinative; that is, if they knew or should have known through the exercise of due diligence that the accused had rquested counsel, then they would have to comply with that request and desist from further interrogation about the original

crime. On the other hand, if they did not know and could not have known through the exercise of due diligence that the accused had requested counsel, there would be no useful purpose in applying the bright-line rule.

3. We have previously recognized that the "obligations of the military member occasioned by his military status and by the relationships inherent in a military organization are different from those of the citizen to the police." *United States v. Schneider*, 14 M.J. 189, 192 (C.M.A. 1982). Thus, there are situations in military life when there is an obligation to respond to questioning by a superior officer or investigating agent not found in the civilian world. *See, i.e., United States v. Leiffer*, 13 M.J. 337 (C.M.A. 1982); *United States v. Lewis*, 12 M.J. 205 (C.M.A.1982); *United States v. Davenport*, 9 M.J. 364 (C.M.A.1980). *See also California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971). These unique military relationships were recognized by Congress when it enacted Article 31 to insure the protection of a military accused's rights. Additional safeguards engrafted by judicial holdings must be modified to meet the exigencies and realities of the military environment and military missions. Obviously, the flexibility required in a combat situation would prevent strict adherence to the *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), rule. If it is applied in the manner I envision, adherence to that rule would not interfere with military exigencies and requirements.

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tors supposed to learn that the accused had asserted his right to counsel?[5] Certainly the best practice would be to place the duty of relaying a request for counsel on the arresting officer and, similarly, to place an obligation on each interrogating agent to elicit such information.[6] My problem here is that the interrogators did attempt to discover the underlying facts and were prevented from doing so by the accused's own statement denying that he had received a previous advisement of rights. I find no legal impediment to asking an accused if he previously has been advised of his rights, since such information, if provided, would not be incriminating in terms of Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831, even as expanded by *Miranda-Tempia*.[7] In this instance, there is no hint of the "badgering" or "overreaching" which was properly condemned in *Edwards v. Arizona, supra*.[8] Instead, there was a mere seeking of information necessary for the further processing of the accused. Recognizing the military investigative milieu and

parameters of CID and MP investigative jurisdictions, I can understand how the situation before us now could develop innocently.[9] Hence, I am not willing to impose the bright-line rule on the facts before us here. I am also unwilling to let this accused participate in the creation of an erroneous deprivation of his own rights. While we must scrupulously protect the rights of all members of the armed forces who are interrogated, we need not permit them to benefit from their own falsehoods. *See United States v. Sikorski*, 21 U.S.C.M.A. 345, 45 C.M.R. 119 (1972).

The significant difference here from *Edwards* and its progeny is that the interrogators, unaware of the accused's request for counsel, were effectively stopped from making the further inquiries that might have provided them with such knowledge by the accused's own verbal acts. In *Edwards v. Arizona, supra*, 451 U.S. at 479, 101 S.Ct. at 1882, the defendant was told that " 'he had' to talk" the morning after

---

5. CID regulations required agents to interrogate each accused upon his/her receipt into their custody from another agency. Such regulations would not pass the *Edwards* bright-line rule, if an accused had asserted his rights and such fact were known to the CID agents or would be available to them through the use of due diligence.

6. I would require government agents to exercise due diligence in determining whether or not a person being interrogated has been given the opportunity to exercise his constitutional rights. Furthermore, the best practice to be followed by the person to whom a request for counsel is made is for him to convey that request to the appropriate authorities. Each subsequent interrogator has an obligation to find out if such a request has been made. However, I can foresee circumstances where the best and, perhaps the only, source of this information will be the accused himself.

7. I can find nothing here to indicate that these interrogators consciously sought to overbear the accused's will or that they used improper tactics to deprive him of his right to counsel. *Cf. United States v. Muldoon*, 10 M.J. 254 (C.M.A. 1981); *United States v. Hill*, 5 M.J. 114 (C.M.A. 1978); *see also United States v. Peyton*, 10 M.J. 387 (C.M.A.1981).

8. *Miranda v. Arizona* and *United States v. Tempia*, both *supra*.

9. I am aware that Federal Courts of Appeals have rendered decisions which seem to conflict with my interpretation of *Edwards v. Arizona, supra*. In *United States v. Scalf*, 708 F.2d 1540 (10th Cir.1983), the defendants were apprehended by state patrolmen who suspected them of robbing a bank. They were read their *Miranda* rights and requested counsel. After being booked, they were interviewed by FBI agents. At that time, they executed waivers of rights and confessed to the crime. At trial, Scalf moved to suppress his confession. On appeal, the Government argued that *Edwards* did not apply since Scalf's request for counsel was directed to a state patrolman and not to the FBI agents who interrogated him. The Government further asserted that the agents did not know of the request. The Court held that such knowledge was irrelevant. It also held that the fact that the rights advisement came from a member of a different police force was irrelevant. The Court concluded that "once a suspect has invoked the right to counsel, knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect." *Id.* at 1544. Other courts have concluded the same. *Id.*, and cases cited therein. I must respectfully disagree that *Edwards* was intended to be interpreted so rigidly, at least within the military community.

he had terminated interrogation by requesting counsel. The interrogating officers were "colleagues of the officer who had interrogated Edwards the previous night." *Id.* at 479, 101 S.Ct. at 1882. In *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the questioning was stopped when Bradshaw said he wanted to see an attorney. However, while Bradshaw was being transported to the county jail, he asked a police officer, "Well, what is going to happen to me now?" The officer responded with a recitation that Bradshaw had asked for an attorney and he would not talk with him unless it was "at ... [his] own free will." *Id.*, 103 S.Ct. at 2833. Eventually, Bradshaw agreed that he would take a polygraph test the next day and, after failing the test, he ultimately made incriminating statements. In *Solem v. Stumes, supra*, the majority opinion "assume[d] ... that the conduct at issue ... violated *Edwards*," *id.*, 104 S.Ct. at 1341; however, "[a]pplying *Edwards* to this case, the Court of Appeals for the Eighth Circuit [had] found that the police had acted unconstitutionally in twice renewing interrogation after Stumes had invoked his right to counsel." *Id.*, 104 S.Ct. at 1341 (footnote omitted). Finally, in *Smith v. Illinois, supra*, the request for counsel was made to the same interrogator who gave the *Miranda* advisement.

Although the matter was not previously given decisional significance, it appears that, in each of these cases, the interrogator was aware that the accused wished to exercise his right to counsel. I do not suggest that an interrogator's lack of knowledge of an accused's request for counsel by itself provides the excuse to permit the accused's further interrogation by a different interrogator, nor do I suggest that the lack of such knowledge provides an excuse for an accused to be further questioned by an interrogator from a different agency. *Cf. United States v. Downing*, 665 F.2d 404, 407 (1st Cir.1981), where the officer was "negligent" in not eliciting information about the request for counsel.[10] Nevertheless, it is totally reasonable to look at all the circumstances to determine if an interrogator has made a diligent effort to comply with the requirements of *Edwards v. Arizona, supra*, and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[11]

Recognizing that criminal justice is not a game wherein the Government loses if it fails to place the correct symbol in the correct box,[12] I believe that there must be some balancing of equities. What I find disquieting about the circumstances involved in this case is that the interrogators here were not content to rest on their igno-

**10.** *See* n. 7, *supra*.

**11.** In this regard I feel that the following language of the Supreme Court is apposite:

> Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever. The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic. Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose.
>
> \*    \*    \*    \*    \*    \*
>
> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counter-

parts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

*Michigan v. Tucker*, 417 U.S. 433, 446–47, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974).

**12.** *United States v. Ceccolini*, 435 U.S. 268, 279, 98 S.Ct. 1054, 1061, 55 L.Ed.2d 268 (1978), states:

> In holding that considerations relating to the exclusionary rule and the constitutional principles which it is designed to protect must play a factor in the attenuation analysis, we do no more than reaffirm an observation made by this Court half a century ago:
>
> "A criminal prosecution is more than a game in which the Government may be checkmated and the game lost merely because its officers have not played according to rule."
>
> *McGuire v. United States*, 273 U.S. 95, 99 [47 S.Ct. 259, 260, 71 L.Ed. 556] (1927).

rance of the accused's request for counsel; instead, they attempted to learn if a previous advisement of rights had been made that could have resulted in *any* assertion of rights by the accused. Admittedly, their attempt to ascertain this essential information was—in the clear light of appellate hindsight—ineffective, but that ineffectiveness was certainly enhanced by the accused's conduct. In retrospect the interrogators, armed with good-faith ignorance, may well have been negligent in not pursuing the matter further, but was their behavior so culpable that the accused should escape punishment for possessing the illicit drugs found in his room? In what directions should the constitutional balance be tilted?

Since the evidence of record does not satisfy my concerns or answer the questions of my conscience, I concur with the Chief Judge in returning the case for a hearing which, hopefully, will illuminate this issue sufficiently to permit its resolution.