**UNITED STATES, Appellee,**

v.

**Sergeant Edward W. JOHNSON, 458–13–8347, United States Army, Appellant.**

**ACMR 8802567.**

U.S. Army Court of Military Review.

30 April 1990.

---

For Appellant: Captain Deborah C. Olgin, JAGC (argued), Captain Thomas A. Sieg, JAGC (on brief).

For Appellee: Major Martin D. Carpenter, JAGC (argued), Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC (on brief).

Before DeFORD, KANE and WERNER, Appellate Military Judges.

## OPINION OF THE COURT

WERNER, Judge:

On 4 November 1988, contrary to his pleas, the appellant was convicted by a general court-martial composed of officer and enlisted members of conspiracy to commit larceny, falsely signing official documents with intent to deceive, and larceny in violation of Articles 81, 107, and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 907, and 921 (1982) [hereinafter UCMJ].[1] His approved sentence includes a bad-conduct discharge, confinement for two years, forfeiture of all pay and allowances, and reduction to Private E1.

### I

Appellate defense counsel initially alleged that the charge of falsely signing an official document was multiplicious and failed to state an offense. Although appellant's allegations are mooted by our disposition of this case *infra*, the latter deserves comment. The allegedly defective specification reads:

In that SGT Nathaniel Lokey, US Army, HQ & Svc Co, Cbt Spt Bn, Berlin Brigade, did, at Berlin, Germany, on divers occasions between on or about 1 September 1987 to on or about 30 April 1988, with intent to deceive, knowingly sign official documents relating to SGT Edward W. Johnson's pay, to wit: [22 pay vouchers (DA Forms 2139) and 11 substantiating document worksheets (DA Forms 4444–R)], which documents were totally false and was then known by the said SGT Edward W. Johnson and SGT Nathaniel Lokey to be so false.

The appellant prays that we dismiss the specification because it does not name him as the accused and does not allege that he committed the offense as a principal. The test for legal sufficiency of a specification is whether it contains the elements of the offense intended to be charged; sufficiently apprises the accused of what he must defend against; and in the event of subsequent proceedings, protects him from double jeopardy. *United States v. Sell*, 11 C.M.R. 202 (C.M.A.1953). In general, substantive deficiencies in specifications are not waived by a defense failure to object at trial or by a plea of guilty and may be raised at any time. *United States v. Moore*, 26 C.M.R. 502 (C.M.A.1958); *United States v. Fout*, 13 C.M.R. 121 (C.M.A.1953). A specification that fails to allege that the accused committed the offense "is so defective in form or substance that it will not support a conviction, ... cannot form the basis of proceedings which will put [the] accused in jeopardy and bar another prosecution." 22 C.J.S. Criminal Law § 246. However,

[w]here ... the specification is not so defective that it "cannot within reason be construed to charge a crime," the accused does not challenge the specification at trial, pleads guilty, has a pretrial agreement, satisfactorily completes the providence inquiry, and has suffered no prejudice, the conviction will not be reversed on the basis of defects in the specification.

*United States v. Watkins*, 21 M.J. 208, 210, *reconsideration den.*, 22 M.J. 109 (C.M.A. 1986).

We agree that the specification set out above does not name the appellant as a perpetrator and thus does not appear to

---

1. The charges allege that appellant conspired with a clerk in the local finance and accounting office to defraud the United States of currency. Pursuant to their scheme, appellant purportedly filed false documents for advance pay through his cohort who would make the payments and then conceal the existence of the unauthorized transactions through "creative bookkeeping".

protect him from subsequent prosecution. Yet, appellant did not object to the defect or move that the specification be made more definite. Instead, he expressly waived reading of the charges. Furthermore, we observe that all elements of the offense were properly alleged; there were no defects in the other two charges before the court; and all charges were referred to trial on a charge sheet indicating that appellant was the accused. We conclude that appellant was not misled as to the fact that he was charged with having signed a false official document. The long-standing military rule of procedure, presently incorporated in Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial [hereinafter R.C.M.] 307(c)(3), provides that no particular format is required to allege an offense so long as it sets forth "every element of the charged offense expressly or by necessary implication". We hold that the failure to name appellant as the accused in the specification is an error which was waived by appellant.

Appellant has attempted to distinguish this case from the Court of Military Appeals' upholding of a defective AWOL specification in *United States v. Watkins, supra*. He contends that the principle espoused in *Watkins* should apply only when the accused pleads guilty. We do not read *Watkins* so narrowly:

A flawed specification first challenged after trial, however, is viewed with greater tolerance than one which was attacked before findings and sentence. Although failure of a specification to state an offense is a fundamental defect which can be raised at any time, we choose to follow the rule of most federal courts of liberally construing specifications in favor of validity when they are challenged for the first time on appeal.

*United States v. Watkins*, 21 M.J. at 209 (citations omitted). *See also United States v. Bryant*, 30 M.J. 72 (C.M.A.1990); *United States v. Wilkins*, 29 M.J. 421 (C.M.A. 1990).

Moreover, the Court indicated that the appellant's plea of guilty was an *additional* factor to be considered in determining

whether to affirm findings of guilty of specifications containing variances not challenged at trial; and opined, "To the extent that *United States v. Fout, supra*, holds to the contrary, it is overruled." *United States v. Watkins*, 21 M.J. at 210.

▇ Appellant's assertion that the specification should have charged him as a principal is likewise without legal support. It is permissible under R.C.M. 307(c)(3) to charge "[a]ll principals as if each was the perpetrator." *See* R.C.M. 307 discussion. Accordingly, we decline to dismiss the specification for failure to state an offense.

## II

Upon initial examination of this case, we specified the following issue:

IS THE EVIDENCE OF RECORD SUFFICIENT TO SUPPORT APPELLANT'S CONVICTION OF CONSPIRACY TO COMMIT LARCENY, LARCENY AND FALSE OFFICIAL STATEMENT?

After considering the briefs and oral arguments of the parties and the entire record, on 6 December 1989, by separate order (see Appendix), we set aside the findings of guilty and the sentence and dismissed all charges and specifications. The opinion that follows sets forth our reasons for that action.

At the outset, we observe that there is no direct evidence of record to prove appellant's guilt of any of the offenses. Specifically, there is no evidence that appellant made an illicit agreement with anyone or possessed the requisite *mens rea* to commit larceny. Nor is there direct evidence that appellant signed an official document with intent to deceive or defraud or aided and abetted another in so doing. Conceding these facts, the government nevertheless contends, as it did at trial, that there is sufficient circumstantial evidence to support the court's findings. We disagree.

### A. Applicable Legal Principles

The constitutional standard to be applied on appellate review of a criminal trial to determine the legal sufficiency of the evidence was established by the Supreme

Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and acknowledged by the Court of Military Appeals in *United States v. Hart*, 25 M.J. 143 (C.M.A.1987). It provides, in part:

> [T]he relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

*United States v. Hart*, 25 M.J. at 146 (citation omitted).

■ Our statutory review authority is uniquely broader than that afforded most appellate courts.

A Court of Military Review has independent fact-finding power. In the exercise of that power, the court can "weigh the evidence ... and determine controverted questions of fact" differently from the court-martial. Article 66(c), Uniform Code of Military Justice, 10 U.S.C. § 866; *United States v. Baldwin*, 17 U.S.C.M.A. 72, 37 C.M.R. 336 (1967); *United States v. Remele*, 13 U.S.C.M.A. 617, 33 C.M.R. 149 (1963).

*United States v. Sikorski*, 45 C.M.R. 119, 122 (C.M.A.1972). Our power to overturn a court-martial's factual findings is circum-

scribed by that language in Article 66(c), UCMJ, 10 U.S.C. § 866(c), which cautions us to bear in mind that the "trial court saw and heard the witnesses". Thus, in cases where witness credibility plays a critical role in the outcome of the trial, we hesitate to second-guess the court's findings. *United States v. Albright*, 26 C.M.R. 408 (C.M.A.1958).[2] Conversely, where those findings do not depend on the court's observation of the witnesses, our independence as a fact-finder should only be constrained by the evidence of record and the logical inferences emanating therefrom. The Court of Military Appeals has held:

> For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt.

*United States v. Turner*, 25 M.J. 324, 324 (C.M.A.1987); *accord United States v. Cooper*, 28 M.J. 810 (A.C.M.R.1989).

### B. Evidence of Record

#### 1. For the Government

The Government's case consisted of testimony from three witnesses, numerous documents filed in the finance and accounting office (FAO) and appellant's official finance records, and a signed, uncounseled statement given by the appellant to a criminal investigator after he was interviewed about the offenses.

Master Sergeant (MSG) Kunkle, a specialist in personnel matters, testified that in April or May of 1988, while inspecting the personnel and finance records of appellant's unit, he discovered an irregularity in one of appellant's leave and earnings statements (LES) relative to appellant's receipt

---

**2.** Our factual evaluations are normally binding on the Court of Military Appeals which has held, "[W]e may not overturn a truly factual determination based upon the evidence of record made by intermediate appellate bodies possessed of fact-finding jurisdiction." United States v. Alaniz, 26 C.M.R. 313, 317 (C.M.A. 1958); *See also* United States v. Gwaltney, 43

C.M.R. 328, 330 (C.M.A.1971). However, from time to time and not without self-criticism, the Court has released itself from this legal straitjacket. *United States v. Loukas*, 29 M.J. 385, 396 (C.M.A.1990) (Everett, C.J. dissenting); United States v. Brown, 3 M.J. 402, 404 (C.M.A. 1977) (Fletcher, C.J. dissenting).

of casual pay.[3] He brought the matter to the attention of supervisory personnel at appellant's unit and the local FAO thereby triggering an inquiry into the cause of the irregularity. The inquiry disclosed that appellant had received an abnormally large amount of money in casual pay between August 1987 and April 1988. Also, there was evidence that appellant had a history of indebtedness, had been counseled for writing bad checks and had not obtained official permission from his unit to visit the FAO to request casual pay.[4]

Special Agent (SA) Pierce, an investigator assigned to the Criminal Investigation Division (CID) in Berlin, conducted the criminal investigation that led to the charges against the appellant. He testified that he had received special training in "economic crimes" and was qualified to explain the significance of the documentary evidence that had been taken from appellant's finance records. According to Pierce, appellant's records showed that in August 1987, appellant was indebted to the United States in the amount of $1884.00 as a result of having previously received advance pay. Over the succeeding seven months, appellant apparently requested and received casual pay on twenty-two occasions in amounts ranging from $300.00 to $1,500.00 for a total of $16,000.00. These payments were recorded on military pay vouchers (DA Forms 2139) which were introduced into evidence and indicated the amount paid, the reason for the payment, and that it was approved by an authorized official of the FAO. All of the vouchers were signed by Sergeant Lokey "for the finance officer." SA Pierce determined

that certain information contained in the pay vouchers looked suspicious partly because the payments were made contrary to established procedures and the information was contradicted by other documents in the appellant's finance records. He concluded that appellant should not have been authorized casual pay.

SA Pierce testified that, with certain exceptions, a servicemember "cannot draw more casual payments than what you're able to pay back at the end of the month." In other words, a casual pay is an advance of pay which is supposed to be deducted from the servicemember's next paycheck. Since appellant's pay entitlement minus deductions for preexisting indebtedness was considerably less than many of the casual payments he had received, SA Pierce believed those payments were excessive. Moreover, the reasons listed on the DA Forms 2139 which purportedly supported the payments were inconsistent with other information on appellant's LES. For example, the majority of DA Forms 2139 showed that the appellant was issued casual pay because he had not received his regular "mid month" or "end of month" pay. However, his LES indicated that those payments had been made.

Although the appellant's LES showed that the money owed for casual payments was collected from his pay at the end of each month, SA Pierce discovered a more glaring irregularity. Beginning with appellant's LES of December 1987, appellant was credited with additional money in an amount equivalent to that collected for the previous month's casual pay. This payment, known as a "pay casual pay" is gen-

---

**3.** In the context of this case, casual pay, also called advance pay, refers to the advance payment of base pay and allowances which a member would be entitled to receive in the future. Normally, it is payable for a limited time and under limited conditions. A leave and earnings statement is a computer-generated printout issued to servicemembers at the end of each month. It reflects the financial transactions that occurred during the preceding month and the status of the servicemember's leave, pay entitlements and collections, indebtedness to the government and tax data. The information is sometimes difficult for anyone other than FAO

personnel to understand because it appears in the form of computer codes and abbreviations.

**4.** The established procedure required that before a servicemember could make an appointment at the FAO, he had to obtain permission from his commander. Usually, permission would not be granted unless he had an personal emergency or other justification for casual pay. The commander's approval would be reflected on a Department of the Army (DA) Form 2142 which the servicemember would deliver to the FAO at his appointment. The appellant's finance records did not contain any record of this form.

erally used to indemnify a servicemember for a previous erroneous or improper collection by the government. There were ten "substantiating document worksheets" reflecting these transactions (DA Forms 4444–R) that collectively credited the appellant with $10,100.00.[5] These worksheets were signed by Sergeant Lokey who certified that the credit was for moneys "erroneously collected due to finance error." SA Pierce found no support for Sergeant Lokey's certification.

Despite his suspicions, SA Pierce testified that the appellant was very cooperative during a lengthy interview with him. After waiving his rights to counsel and to remain silent, the appellant made an exculpatory statement in which he admitted receiving the casual payments but explained that they were the result of efforts by Sergeant Lokey to help him solve his financial problems. He said he used the money to purchase and rent automobiles. He denied intending any impropriety and stated that he couldn't believe anybody thought he did anything wrong. He said he never examined his monthly LES to determine the extent of his indebtedness to the government.

Master Sergeant (MSG) McWhorter, the noncommissioned officer-in-charge of the FAO, corroborated SA Pierce's testimony concerning the irregularities involving appellant's casual pay and pay casual pay transactions. He described a casual payment as any payment "other than the normal Army pay" that should not exceed net base pay or create a debt lasting beyond the pay period for which the payment was made. Generally, it is payable when a servicemember needs money to meet a personal emergency. Although regulations do not specifically define what constitutes an emergency, MSG McWhorter opined it did not include debt consolidation or purchase of an automobile. FAO procedures require commander verification of the emergency on a DA Form 2142 before the servicemember may be authorized casual pay. MSG McWhorter confirmed that a pay casual

pay is a pay credit appearing on a servicemember's LES. He added that it was a very uncommon transaction which required additional documentary support and audit controls before it would be entered on the LES and would be subject to post facto audit.

MSG McWhorter's review of the casual pay and pay casual pay transactions relative to the charges against the appellant revealed that the payments were improper. As to the casual pay, there were no DA Forms 2142 to verify the nature of appellant's personal emergency; and the amount of the payments exceeded appellant's net pay for the period. As to the pay casual pay, the documents purporting to support the payments (DA Forms 2139 and 4444–R) were materially false. On cross-examination, MSG McWhorter admitted that sometimes casual pay is given without the DA Form 2142 to verify that the servicemember faced a personal emergency. He conceded that servicemembers usually know less about finance regulations and procedures than FAO personnel and believed it reasonable for them to rely on their advice. He also believed that the improper payments to the appellant could not have been made without Sergeant Lokey's intentional circumvention of established procedures and the absence of effective audit controls within the FAO.

### 2. For the Defense

Sergeant Lokey was Chief of Financial Services for the FAO in Berlin, and was responsible for handling all pay inquiries and signing all casual and advance payments. Although he had been in the Army for six years, he had been a finance clerk for only two and a half years. He testified that he had received no "specific training on casual payments" other than "what I learned ... on the job—by doing it on and on." He learned about pay casual payments "from the office here." He "had never seen one done before ... till I got here." He characterized the transaction as one that is "not a routine" but rather "that you take care of problems with." He

---

**5.** An eleventh DA Form 4444–R was not introduced into evidence although the appellant's LES indicated that he had been credited with an additional pay casual pay of $1,000.00.

would not expect someone untrained in FAO procedures to know about it.

Sergeant Lokey met the appellant in June or July 1987 during football practice with the unit football team. The two were not close personal friends nor did they otherwise socialize. His official contact with the appellant began when the latter came to the FAO in August 1987 to inquire why his paycheck hadn't been deposited in his checking account with the Fort Campbell Credit Union. Appellant told him that his personal checks were being dishonored for insufficient funds. As he was receiving no pay, the appellant asked Sergeant Lokey for a casual pay and Lokey obliged him. He told appellant that the money would have to be repaid and that it would be deducted from his pay in the future. At the time, Sergeant Lokey attributed appellant's difficulty to administrative errors and delays in electronically transferring appellant's pay credits to his checking account. Apparently, this was not an uncommon problem in Army finance and accounting offices and Sergeant Lokey thought it would eventually be corrected.

Over the next seven months, the appellant returned to the FAO twenty-one times to request casual pay. On each occasion, Sergeant Lokey granted his request even though the appellant's monthly paycheck was insufficient to extinguish the indebtedness and without inquiring whether the appellant had a bona fide emergency to support the request. During this time, he realized that appellant's pay problem was more complicated than he originally thought. He may have also known that if the casual payments were discovered during an audit, it could have had adverse consequences for him. Sergeant Lokey decided to conceal the deficit in appellant's records by crediting the appellant with a "pay casual pay." He acknowledged that he may have violated established FAO procedures but averred that he did not know it

was improper at the time. He stated that he "wasn't hiding [the deficit]. It showed on [appellant's] LES every month."

Sergeant Lokey also testified that he thought the appellant was entitled to quarters allowances which had not been paid to him during his previous duty assignment. Although he later learned that appellant was not entitled to the allowances, he indicated that his initial, erroneous belief influenced his decision to issue appellant the casual pay. In his testimony, Sergeant Lokey stated:

> I was just trying to help the soldier out, sir. I seen he was getting hisself more and more into a financial bind and I was just trying to help him out till he got hisself squared away, financially. On some of the "pay casual payments" I was paying him, sir, he thought he was entitled to BAQ—which I thought he was entitled to BAQ, too, because I didn't know, at the time, he was staying in Government quarters, okay, and I was paying him for the BAQ. I was also doing that as a "pay casual payment", also. That would save myself time to have to do the long process in the Finance Office.[6]

> \*   \*   \*   \*   \*   \*

> Once I saw that he was squared away financially, sir, I would take the money back out of the pay.

On cross-examination, Sergeant Lokey stated that he believed that by authorizing casual pay, the government was acting as "a loaning institution ... to a certain extent." He said he would have issued the casual pay whether or not the recipient had a bona fide emergency "because I know emergency does come up." He admitted he would "lie to help the solider"; and that he had been convicted by a general court-martial for falsifying the documents involved in appellant's case.

6. "BAQ" is an acronym for "Basic Allowance for Quarters", an entitlement that is normally payable to servicemembers and their family members when government quarters are not available. Conversely, when servicemembers do reside in government quarters, they are normally not entitled to BAQ. However, there are exceptions to the foregoing general rules. See Army Regulation 37–104–3, Financial Administration, Military Pay and Allowance Procedures, Joint Uniform Military Pay System–Army (JUMPS), Chapter 21, 3 March 1988.

The appellant had been in the Army twelve years during which time he served primarily as a personnel administrator and information systems manager. His records indicated he was of average intelligence having attained a score of 103 on the Army general intelligence test. He testified that when he arrived in Berlin in April 1987 after a tour of duty at Fort Campbell, Kentucky, he had personal indebtedness of $2500. He was also indebted to the government for casual pay advanced to him before he arrived in Berlin. Nearly all of his monthly paycheck was being deducted to meet financial obligations to creditors and support family members. The remainder ($396.00) was ostensibly being deposited electronically in appellant's checking account with the Fort Campbell Credit Union. Several months after his arrival in Berlin, he started receiving notices from the credit union that his account was overdrawn and his personal checks were being returned for insufficient funds. He said this surprised him as his LES indicated that a portion of his monthly pay had been deposited in his account.

The appellant sought assistance from his personnel section and first sergeant about the indebtedness and bad checks, but the latter "didn't know too much about LES's as much as [appellant] did." Appellant further related:

My LES said money supposed to be going there. We even went through and tried to get through to Fort Campbell and get them to send a statement saying —explaining, saying is the money getting there, is it getting there late or what. We never heard anything from them. The First Sergeant made me cancel that out and he told me I shouldn't have left that account there. I should have came here and opened an account here. He suggested that I cancel that and go over here and start an account here. That's exactly what I done—after I got my ID card stamped, sir.

The appellant also went to the FAO where he related his problem to Sergeant Lokey and requested casual pay. He testified that he did not think this was improper because it had been standard practice to do this on a previous tour of duty. Moreover, since Sergeant Lokey told him he was entitled to receive casual pay and in fact helped him obtain it, he believed he could rely on his advice. The appellant also stated that he did not read his LES to determine the status of his indebtedness nor did he know that he was being credited with a pay casual pay that effectively cancelled the obligation in his finance records. The record of trial reveals the following dialogue between appellant and his defense counsel:

Q. Now, the first time you received a casual payment, did you check your LES to see if the money was coming out?

A. No, sir, I did not.

Q. Why?

A. I was told that the money would be coming out the next month. That's the way I took it.

Q. Sergeant Johnson, can you tell the panel members about your ability to read and understand an LES?

A. Ever since I've been in the Army—I have been in the Army—I just went over twelve years this year—I've—the only thing I have done with my LES, I know where your allotment's at and where you got—what you know when you're getting paid for that month.

Q. And so what would you do with your LES's?

A. Put it in my drawer. Some of them might get throwed away.

Q. Starting in December, there began this "pay casual payments" listed on the LES's. Did you ever observe that?

A. No, sir, I did not. Actually, around about December, I even stopped looking at them because I wasn't going to be getting no money. I knew that. I knew Uncle Sam was getting their money back so it wasn't any use for me to even pay any attention to them so I didn't even give—at all check them out.

He denied making any agreement with Sergeant Lokey to defraud the government or assisting him in completing any of the documents needed to obtain the casual pay. The only form he signed was a receipt for the money given to him.

The appellant also related that when his finance records were reviewed by FAO personnel as he was departing Fort Campbell, he was informed that he should have been paid an allowance for quarters for a period of twelve months. He was told to file a claim for the unpaid allowances when he arrived in Berlin. The appellant indicated that he had signed for government quarters upon his arrival at Fort Campbell in 1985 in anticipation of living in them with his family. However, he never occupied them because his family did not move from their residence in Portsmouth, Virginia, to his duty station in Kentucky. As a consequence, he lived in the barracks, but, for reasons not fully explained in the record, did not receive his quarters allowance.[7]

3. Evidence in Rebuttal/Surrebuttal

Over the objection of the defense, the government introduced documentary evidence taken from appellant's finance records reflecting that he was paid a travel allowance for moving his family from Fort Campbell to Portsmouth. This implied that appellant had not been entitled to BAQ as he had testified. The military judge ruled that the evidence was admissible for the limited purpose of impeaching the appellant's testimony that his family did not reside at Fort Campbell. Appellant moved for a continuance to call witnesses from the United States to corroborate his story, but the judge denied his motion.

In surrebuttal, the appellant reiterated that his family had not resided with him at Fort Campbell and further explained:

[L]ike I said earlier in my statement—my testimony, we was in the process of trying to get my family to Fort Campbell but they—she couldn't get transferred there. I had some furniture in storage at Fort Campbell that is on there and plus I had rented a U–Haul and moved that stuff to Virginia, myself. This claim that—this travel here and that I have, this is what I have been paid for it and I think, if I am not mistaken, this was also made up at Finance when I was outprocessing there at Fort Campbell.

In response to a question from the trial counsel, the appellant admitted that he signed a certification on one of the documents attesting to the fact that he moved his family from Fort Campbell to Portsmouth. However, he maintained that the document had been "filled out by someone else" and that he had signed it "by mistake."

C. Sufficiency of the Evidence

1. Legal Sufficiency

■ We hold that the evidence is insufficient as a matter of law to establish appellant's guilt of the offenses under the criteria set forth in *Jackson v. Virginia*, and *United States v. Hart*, both *supra*. At trial, the government predicated its case for larceny on the theory that the appellant, acting pursuant to an illicit agreement with a finance clerk, wrongfully obtained money in the form of casual pay by falsely representing his entitlement thereto. Then they concealed their delict by filing false documents in order to effect a pay casual pay transaction that cancelled appellant's obligation to repay the money on his finance records.[8] Article 121 proscribes lar-

---

**7.** Under the factual scenario related by the appellant, he may have been entitled to a quarters allowance for the period in question. If he had failed to notify proper authorities that his family had not joined him and that he had not resided in the quarters for which he had signed, then it is conceivable he might not have been reimbursed. The question of appellant's entitlement to unreimbursed BAQ was never fully resolved at trial because the military judge denied the appellant's motion for the appearance of witnesses who might have corroborated his testimony.

**8.** The appellant obtained $16,000.00 in casual payments but was only charged with larceny of

$11,100.00. The latter sum was the amount of money cancelled as a result of the pay casual payments. Appellate government counsel have suggested in their brief that the appellant's wrongful obtaining of money occurred when he "failed to inquire into the legitimacy of the ... pay casual payments/credits." We reject this theory as untenable. If the obtaining of casual pay was not unlawful in the first instance, appellant would merely have been civilly liable to the United States for a lawfully acquired debt. A misrepresentation which enables a debtor to cancel his liability to repay a debt is, in the absence of a fiduciary duty to account, not larceny. *United States v. Mervine*, 26 M.J. 482 (C.M.A.1988); *United States v. Haskins*, 29

ceny by false pretenses. Several provisions of the Manual for Courts–Martial, United States, 1984, [hereinafter MCM 1984], are relevant to this case. MCM 1984, Part IV, para. 46c(1)(d) provides, in part, that:

> an obtaining of property from the possession of another is wrongful if the obtaining is by false pretenses. However, such an act is not wrongful if it is authorized by law or apparently lawful superior orders, or, generally, if done by a person who has a right to the possession of the property either equal to or greater than the right of one from whose possession the property is ... obtained ....

MCM 1984, Part IV, para. 46c(1)(e) further provides:

> Although the pretense need not be the sole cause inducing the owner to part with the property, it must be an effective and intentional cause of the obtaining. A false representation made after the property was obtained will not result in a violation of Article 121.

MCM 1984, Part IV, para. 46c(1)(f)(i) provides:

> The offense of larceny requires that the ... obtaining ... by the thief be accompanied by an intent permanently to deprive or defraud another of the use and benefit of property or permanently appropriate the property to the thief's own use or the use of any person other than the owner.

■ Given the state of the evidence in this case, the government faced two hurdles in its quest to establish legal sufficiency. First, it had to prove that the appellant intentionally employed a false pretense that effectively caused him to obtain casual pay. Second, it had to prove that he possessed the requisite *mens rea*. The circumstantial evidence purporting to support the government's case fails to establish that the appellant misrepresented crucial facts or that he specifically intended to commit the offense of larceny.

First, the government argues that we may infer a wrongful obtaining of casual pay from appellant's prior association with Sergeant Lokey and the fact that the money could not have been obtained without Lokey's help in falsifying documents. In effect, the government has argued that although there was no direct evidence that the appellant misrepresented his reasons for needing a casual pay to Lokey, he should be held criminally liable as an accomplice for the false statements made by Lokey on the pay vouchers (DA Forms 2139). However, appellant and Lokey were not close friends and did not socialize off-duty. Their initial meeting at the FAO appeared to be fortuitous and their limited association on the unit football team did not appear to influence Lokey's decision to issue casual pay. The overwhelming evidence indicates Lokey issued the casual payments because the appellant's financial situation was desperate, his finance records were in disarray, and no one else was helping him correct the problem. It also appears that Lokey was trying to save himself from having to use more cumbersome, time-consuming procedures to put appellant's records in order. Under the circumstances, even though appellant's pay vouchers (DA Forms 2139) may have contained a misrepresentation, the evidence did not establish that appellant was the cause of it.

Additionally, the government points out that appellant requested casual pay in excess of his monthly pay in violation of FAO directives. Assuming that it was improper for appellant to receive excessive amounts of casual pay, the government failed to show that the accused knew of that fact or misrepresented his entitlement to Lokey. Although the government tried to show that appellant had sufficient administrative acumen to understand the subleties of the Army finance system, the overwhelming

---

C.M.R. 181 (C.M.A.1960); *United States v. Searcy*, 24 M.J. 943 (A.C.M.R.1987); MCM 1984, Part IV, para 46c(1)(b). Hence, even if appellant procured the pay casual pay by misrepresentation, his receipt of pay casual pay would have

only amounted to a debt cancellation. This might have been offensive to other codal provisions but it would not have been a violation of Article 121.

impression emanating from the appellant's testimony indicated otherwise. Appellant, like so many other servicemembers, had difficulty understanding his LES. He testified that on a previous duty assignment he obtained a casual pay merely by asking for it. The two finance clerks who testified (Lokey and McWhorter) stated that because FAO procedures are not generally understood by servicemembers, it was necessary for them to rely on information and advice from FAO personnel. The Court of Military Appeals has noted, "One with only limited service experience can attest to the reliance almost inevitably placed on the efficiency of finance office personnel in matters involving the payment of travel and other allowances." *United States v. Sicley*, 20 C.M.R. 118 (C.M.A.1955). The payment of excessive casual pay to a servicemember by a finance clerk with actual authority to make such payment, does not, by itself, support an inference that the payment was the result of the servicemember's misrepresentation. At best, the government showed that Lokey's payment to appellant may have been improper under FAO regulations applicable to Lokey's conduct, not appellant's. In the absence of any evidence of concerted action, between appellant and Lokey, he cannot be charged with Lokey's violation of FAO regulations in issuing the payment to him.

Secondly, the government asserts we may infer *mens rea* from appellant's failure to properly request permission from his unit before going to the FAO. Although appellant did not obtain the document normally issued for appointments (DA Form 2142), there was no showing that he knew of the requirement or that he deliberately circumvented it as part of a fraudulent scheme. In any event, MSG McWhorter said that casual pay is sometimes issued without presentation of a DA Form 2142. Moreover, appellant initially told his first sergeant about his financial problems but did not receive any help in their resolution. Instead, he received counseling concerning his bad checks and indebtedness and had his check cashing privileges withdrawn. He also was told to close out his checking account at Fort Campbell and start one in

Berlin. From the appellant's perspective, the first sergeant's counseling was not only ineffective in resolving his problem, it was also dumb. Appellant was stationed in a foreign country and was receiving no money on which to live. Clearly, he was compelled by circumstances to go to the FAO for assistance only as a last resort, not to defraud the government.

The government's final point is that appellant's acceptance of the pay casual pay indicates culpability. Here again, there is no evidence that appellant knew or understood the significance of the transaction. Even if he read his LES, as the government argues he must have done considering his twelve years of military service, the evidence is compelling that he wouldn't have understood what the entry meant. It also shows that Sergeant Lokey took it on himself to effect the transaction to cover-up his own improprieties in issuing appellant casual pay in contravention of FAO regulations.

■ We also conclude that the government's case is legally deficient with respect to the conspiracy and false official document charges. These two offenses are interrelated in that the allegedly false documents were the means used to effect the object of the conspiracy and are therefore multiplicious for findings. *United States v. Gans*, 23 M.J. 540 (A.C.M.R.1986). To establish the conspiracy, the government had to prove that there was " 'some competent evidence' from which the [court] could have found, beyond a reasonable doubt, the existence of a criminal agreement." *United States v. Jackson*, 20 M.J. 68, 70 (C.M.A. 1985). "The agreement ... need not be in any particular form or manifested in any formal words ... It is sufficient if the minds of the parties arrive at a common understanding to accomplish the object of the conspiracy, and this may be shown by the conduct of the parties." MCM 1984, Part IV, para. 5c(2). We find no basis in law and logic to support the government's argument that the transactions could not have been effected without an unlawful agreement between appellant and Lokey. It is equally inferable (and the evidence

proves) that Lokey acted on his own and in contravention of FAO regulations by issuing appellant casual pay, falsifying official documents and attempting to conceal those earlier delicts by effecting pay casual pay transactions.

## 2. Factual Sufficiency

We also find the evidence factually insufficient to support any of the offenses. The essence of the government's case was that the appellant could not have obtained casual payments and their subsequent cancellation through pay casual payments without having conspired with Lokey to steal the money. The defense's case in opposition consisted of testimonial evidence from the appellant and Lokey tending to show that there was no conspiracy, no wrongful obtaining and no *mens rea*. Although the trial counsel decried their credibility, he did not impeach them with countervailing evidence but rather by insinuating that their testimony was inherently incredible. Neither Lokey nor the appellant presented themselves as outstanding soldiers or believable witnesses. Undoubtedly, Lokey's admissions that he was convicted of falsifying documents and that he would "lie to help the solider" adversely affected his credibility in the eyes of the court members. Moreover, the appellant's inability to manage his personal finances or to understand certain aspects of the Army finance system made him an unsympathetic figure. Although we can understand how the court members might have been influenced by these factors to convict the appellant of all charges and specifications, we are not as easily swayed. We do not find it curious or implausible that a servicemember would not know about certain unusual entitlements to pay or allowances or how to read an LES. The complexity of the military pay and allowance system and the use of computerized entries on the LES would tend to confuse anyone, including those reasonably familiar with the system.

Our examination of the record reveals a dearth of substantive evidence to contradict the appellant and Lokey or to demonstrate that their "version of the transactions [was] so inherently improbable as to defy credulity". *United States v. Newsom*, 38 C.M.R. 833, 837 (A.F.B.R.), *pet. denied* 38 C.M.R. 441 (C.M.A.1967). The appellant, a career soldier with an inability to manage his finances, discovers that a portion of his pay is not being credited to his checking account with the Fort Campbell Credit Union when his checks drawn on the account are dishonored. It appears to him from reading his LES that the money should have been credited and that either the government or the credit union is responsible for the omission. He consults his personnel section and his first sergeant but receives no assistance with the problem. Instead he is counseled for indebtedness and administratively punished for writing bad checks. As a last resort, he turns to the FAO where he meets Sergeant Lokey, an individual he knows from the unit football team. Lokey doesn't understand why appellant's pay is not being credited to appellant's account as his finance records show he has "direct deposit." He also believes appellant's claim that the government owed him for twelve months of unpaid BAQ. Through misguided altruism and to save himself time and effort, he decides to violate FAO regulations by issuing appellant casual pay until his financial problem can be resolved. He may have known that his actions would not be audited in the near future because the Control Section of the FAO was not operational. However, he finds that the appellant's financial problems worsen with time. In order to cover up his violations of regulations, he executes several pay casual pay transactions without appellant's knowledge believing he can eventually collect the money from appellant's pay without being detected. But, before he can do so, he is discovered. We find the defense's version of the facts to be more plausible than the government's. The testimony of appellant and Lokey were logical and consistent with each other and with appellant's pretrial statement to SA Pierce. They clearly demonstrate that the appellant made no false representations and had no intent to steal when he obtained the casual pay. Nor was

there an illicit agreement to defraud the government.

Although the government's circumstantial evidence made out a prima facie case and thereby shifted the burden of going forward to the defense, the defense's direct evidence successfully met that burden. The government's rebuttal evidence did not contradict the defense's evidence and thereby failed to meet the reciprocal burden that evolved from the defense's case. *See United States v. Wilkey*, 10 C.M.R. 334 (A.B.R. 1952), *pet. denied* 11 C.M.R. 248 (C.M.A. 1953). To the contrary, significant aspects of the defense's case are supported by the government's own witnesses and evidence. MSG McWhorter confirmed that the FAO's Control Section was nonexistent and could not perform required internal audits; SA Pierce indicated that appellant appeared to be candid when he interviewed him; and appellant's LES of August 1987 showed that nearly $396.00 of his pay was supposed to have been credited to his account with the Fort Campbell Credit Union. In its totality, the evidence of record is more probative of appellant's innocence than his guilt.

### III. Additional Matters

There are other significant legal issues which were raised by the evidence but which were not thoroughly litigated at trial or examined in the post-trial review process. These include: 1) whether appellant was in fact entitled to casual pay pursuant to a valid "claim of right" from the allegedly unpaid BAQ and unreceived monthly paychecks; 2) whether, in obtaining casual pay, the appellant acted pursuant to an honest but mistaken belief or an honest and reasonable but mistaken belief that he was entitled to compensation for the allegedly unpaid BAQ and the unreceived monthly paychecks; 3) whether the military judge erred in failing *sua sponte* to instruct the court-martial concerning the foregoing issues; 4) whether the military judge abused his discretion in denying appellant's motion for a continuance in order to call surrebuttal witnesses from the United States after he permitted the government to introduce rebuttal evidence that impeached both the appellant's credibility and the honesty of his belief concerning his entitlement to unpaid BAQ; and 5) whether the trial counsel's argument was prejudicially improper because it contained extensive personal attacks on appellant's credibility as a witness and expressions of the trial counsel's personal belief in appellant's guilt, *see United States v. Knickerbocker*, 2 M.J. 128 (C.M.A.1977), deliberate misrepresentations concerning the honesty and reasonableness of appellant's belief of his entitlement to unpaid BAQ and as to whether there was an agreement between the appellant and Sergeant Lokey, and unfair comment on matters not in evidence, *United States v. Clifton*, 15 M.J. 26 (C.M.A.1983). Had these issues been properly litigated, appellant's innocence of the charges might have become apparent at trial.

The findings of guilty and the sentence are set aside. The charges are dismissed.

Senior Judge DeFORD and Judge KANE concur.

### APPENDIX

### UNITED STATES ARMY COURT OF MILITARY REVIEW

Before

DeFORD, KANE, and WERNER

Appellate Military Judges

United States, Appellee

v.

Sergeant EDWARD W. JOHNSON,

458–13–8347,

United States Army, Appellant

ACMR 8802567

### ORDER

On consideration of the entire record, the briefs of counsel and oral argument, the findings of guilty of all charges and specifications and the sentence are set aside and dismissed. An opinion will follow.

Dated 6 December 1989

FOR THE COURT:
/s/ Mary B. Dennis
MARY B. DENNIS
Deputy Clerk of Court
CF: JALS–DA
JALS–GA
JALS–CRZ
JALS–CCZ
JALS–CCR
JALS–CR2
JALS–CR3
JALS–CR4
JALS–CR5
JALS–CR6