**UNITED STATES, Appellee,**

v.

**Specialist Four Jerome WALKER, SSN 578–74–0101, United States Army, Appellant.**

**CM 440290.**

U. S. Army Court of Military Review.

4 Nov. 1982.

Colonel Edward S. Adamkewicz, Jr., JAGC, Major Elliot J. Clark, Jr., JAGC, Captain David M. England, JAGC, and Major Linus Johnson, JAGC, were on the pleadings for appellant.

Colonel R.R. Boller, JAGC, Major John T. Edwards, JAGC, Major John T. Meixell, JAGC, and Captain Richard P. Laverdure, JAGC, were on the pleadings for appellee.

Before O'DONNELL, FOREMAN and BADAMI, Appellate Military Judges.

### OPINION OF THE COURT

FOREMAN, Judge:

The appellant was convicted of the unpremeditated murders of his wife and stepson in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 (1976). He was sentenced to a dishonorable discharge, confinement at hard labor for life, total forfeitures, and reduction to Private E–1. The convening authority approved the sentence.

At the trial the appellant claimed that his wife and not he had killed his stepson. He defended against the charge of murdering

his wife on the ground of insanity. The issues in this case are whether the military judge's instructions on mental responsibility were correct, and whether the evidence was sufficient to establish that the appellant was sane at the time he killed his wife. We hold that the instructions were correct and the evidence was sufficient.

I

*Factual Background*

The appellant and his wife, Specialist Five Sharon Walker, were assigned to the 3d Armored Division Materiel Management Center (DMMC). Specialist Five Sharon Walker had an illegitimate son, Daimon Poindexter, prior to her marriage to the appellant.

On the evening of Sunday, 16 March 1980, Specialist Five Sharon Walker performed duties as the unit charge of quarters. The appellant visited the unit and, unable to find his wife, became suspicious that she was engaged in extramarital sex with another soldier, a Specialist Davis. The appellant finally found his wife, accused her of infidelity, and struck her during the ensuing argument.

On Monday, 17 March 1980, the appellant was excused from duty to take care of his domestic problems. On Monday afternoon the appellant confronted Specialist Davis, who denied having the appellant's wife in his room the previous night. The appellant brought Davis to his quarters to make the same denials in front of his wife, and Davis did so.

On Monday evening the appellant told his wife he was leaving her. He called his mother, who lives in Washington, D.C., and told her he would be sending her a considerable sum of money. He also called Miss Myrtle Williams, a longtime friend in Washington, D.C., and told her he would be visiting her in the near future. He visited Specialist Five Daniel Williams, a neighbor, and offered to sell him his stereo equipment. Later that evening, he brought his stereo equipment and a television set to the Williams' quarters.

At this point the appellant's version of the events and the government's evidence diverge. The appellant testified that he was awakened before 0800 hours on Tuesday, 18 March 1980, by a telephone call from Sergeant First Class (SFC) Ritter, his supervisor. The appellant told Ritter he would be at work by 0800 hours. The appellant testified that shortly thereafter he saw his wife sitting on Daimon's bed and crying. The appellant discovered that Daimon was dead. The appellant testified that he remembered nothing after discovering Daimon's body until he found himself lying alongside his dead wife several hours later. The appellant further testified that he ingested Drano and Tylenol Tuesday morning in an apparent suicide attempt.

Contrary to the appellant's testimony that both victims died on Tuesday morning, the prosecution's evidence established that they died on Tuesday night or early Wednesday morning. Frank Ordiway, a fifteen-year-old dependent, testified that he saw Sharon Walker in the stairwell of their apartment building at about 1630 hours and in the laundry room at 1900 or 2000 hours on Tuesday, 18 March 1980.

Sergeant First Class Ritter, the appellant's supervisor, testified that on Wednesday morning, when neither the appellant nor Sharon Walker reported for duty, a Sergeant First Class Richard called their home and spoke with the appellant at about 1145 hours. Specialist Five Williams (the person who had purchased the stereo equipment on Monday evening), testified that he saw the appellant at approximately the same time on the balcony of his apartment and spoke to him. The appellant told Williams that his wife had left him. After talking with the appellant on the telephone, SFC Richard went to the appellant's quarters but was denied admittance by the appellant. He went back to work and again called the appellant on the telephone, and the appellant told him that he had ingested Drano and Tylenol. Richard, accompanied by a SFC Campbell, went back to the appellant's quarters, where they found the appellant sitting outside his locked quarters,

retching and spitting. The appellant still refused to allow them to enter the quarters. The two noncommissioned officers then took the appellant to a nearby hospital. Enroute to the hospital the appellant indicated that his wife had left him.

Sharon Walker's commander, Captain Bierie, authorized entry into the quarters, where the bodies of Sharon and Daimon were found at about 1400 hours. Both bodies were lying face down in their respective beds, which were freshly made with clean sheets. Two pathologists placed the time of death of both Sharon and Daimon at between 2000 hours on Tuesday evening and 0200 hours on Wednesday morning. Both victims had died of asphyxiation caused by strangulation and smothering. One pathologist opined that it was unlikely that Sharon had killed Daimon because of the identical manner in which both she and Daimon were killed and because Daimon's neck had bruises but no scratches, and the untrimmed fingernails on Sharon's left hand probably would have left scratch marks on Daimon's neck.

## II

### Psychiatric Evidence

Major Zold, a clinical psychologist, examined the appellant and found that he was depressed and had a dependent character or hysterical personality. Major Zold described the appellant as one who sees the world through "rose-colored glasses." He found that the appellant had a close relationship with his mother, that the mother figure seemed to be more important to him than a wife or girlfriend, and that the appellant placed high symbolic importance on having a son, natural or adopted, to present to his mother. The appellant had been born out of wedlock, and his father had abandoned him and his mother while the appellant was an infant. Because presenting a son to his mother was symbolically so important to the appellant, the loss of that son would be devastating to him.

Because the appellant tends to see the world as he wants it to be rather than as it is, he probably saw his wife as "a very pure angelic-type individual" despite the fact that she already had a child out of wedlock by another man. The appellant would tend to deny evidence contrary to his idealized perceptions of his wife, but once he accepted evidence of reality he would then be overly suspicious of her.

Doctor Chalemian, former division psychiatrist for the 3d Armored Division, examined the appellant extensively and diagnosed him as suffering from an "avoidant personality disorder" also known as an "avoidant character disorder," with periodic depression, anger and anxiety. Doctor Chalemian explained that he made his diagnosis using the standards set out in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (3d edition 1980). Doctor Chalemian explained that there are four categories of mental diseases or defects in psychiatric terminology:

(1) physiological organic psychiatric syndrome;

(2) psychosis, such as schizophrenia;

(3) neurosis, such as depression or phobia; and

(4) a character behavior disorder, such as the avoidant personality disorder suffered by the appellant.

Doctor Chalemian made it clear that the classification of an avoidant personality disorder as a mental disease or defect was a medical rather than a legal definition. Doctor Chalemian further testified that a character behavior disorder in medical terminology is "manifested by life-long inappropriate or inadequate or self-defeating patterns of behavior, . . . where the individual does not necessarily have the internal anxiety needed to change that behavior."

Doctor Chalemian testified that the following are symptoms of an avoidant personality disorder: (1) hypersensitivity to perceived rejection, (2) inordinate need for acceptance and affection, (3) a distancing of oneself from close personal attachments, (4) loss of self-esteem, (5) unwillingness to make any committment to important people in the patient's life without unconditional

guarantees and inordinate amounts of affectionate and responsive behavior, and (6) depression, anger and anxiety. Although only three of the above symptoms are required for the diagnosis of avoidant personality disorder, the appellant exhibited all of them.

Doctor Chalemian's diagnosis was based on the appellant's personal and military history as related to him by the appellant. In spite of a commendable service record during his first enlistment, the appellant was dissatisfied with his performance. Subsequent to his discharge the appellant obtained a civil service job, but was unsatisfied because he did not think he was worthy of it, and, in spite of his supervisor's favorable impressions of him, he thought he did poorly. The appellant reenlisted in the Army so he could regain the security he felt he lacked as a civilian.

In his personal life, the appellant feels responsible for having been born out of wedlock and feels that his life is marred by his illegitimacy. His feelings of unworthiness cause him to regard less than perfect love and affection as rejection. The appellant has an over-idealized perception of his mother and considers himself to be close, perhaps too close, to her, reflecting his need to be accepted by her. Even though objectively he is accepted by his mother, his perception is that his mother will not accept him. The appellant has an unconscious need to be a legitimate son to his mother. The single most important thing in the appellant's life, psychologically, is the need to present a son to his mother so that he can exonerate his own feelings of inadequacy and thereby feel legitimate.

The appellant's over-idealization of his mother also extends to his concept of the family, making him unable to deal with stress and problems within the family. To the appellant, the family is either perfect or there is something profoundly wrong, with no middle ground or room for negotiation.

Doctor Chalemian believed that the appellant's conclusion that his wife had been unfaithful had made him extremely angry and despondent. Doctor Chalemian opined that, at the time he killed his wife, the appellant retained the substantial capacity to appreciate the wrongfulness of his behavior, but was not able to conform his behavior to the requirements of the law. He believed that the appellant's inability to conform his conduct to the requirements of the law lasted only during a blackout of a few minutes' duration, which was triggered by the death of his stepson. The blackout was psychologically induced because the appellant could not deal with the situation in a conscious and reasonable way.

Doctor Chalemian stated that the appellant was medically sane at the time of trial, that his avoidant personality disorder would not be grounds to medically separate him from the Army, and that treatment for an avoidant personality disorder normally is done on an out-patient basis.

Doctor Chalemian stated that the appellant's perception that his wife had been unfaithful could have been the trigger for killing both her and her son, but that it was improbable that the appellant had killed his stepson. On cross-examination, Doctor Chalemian testified that his opinion of the appellant's mental capacity at the time he killed his wife "would possibly be different" if the appellant had killed his stepson, since that opinion is based on two assumptions: (1) that the appellant did not kill his stepson, and (2) that the appellant's claim of a blackout period is true. However, even if these two assumptions are false, it would not change the diagnosis of avoidant personality disorder. Doctor Chalemian testified that he would not be able to testify with any degree of medical certainty about the appellant's mental responsibility at the time he killed his wife if something other than Daimon's death was the trigger for his blackout.

On redirect, Doctor Chalemian testified that if either the trigger or the subsequent blackout did not occur, it most probably would have changed his assessment of the appellant's mental ability to conform his conduct to the requirements of the law.

## III

### The Military Judge's Instructions

The military judge instructed the court members on insanity, partial mental responsibility, and the possible effects of a personality or character disorder on the appellant's ability to form a specific intent to kill or inflict grievous bodily harm. He instructed the court members that the appellant would not be mentally responsible "if at the time of the alleged offense as a result of a mental disease or defect he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." This definition of insanity has been adopted by the Court of Military Appeals. *United States v. Frederick*, 3 M.J. 230 (C.M.A.1977).[1] The military judge informed the court members that they, as the triers of fact, were required to determine whether the term "avoidant personality or character disorder," although a mental disease or defect in medical terms, is a mental disease or defect in legal terms.

The appellant does not challenge the military judge's definition of mental responsibility, but contends that his instructions defining a "mental disease or defect" were deficient, leaving the court members with no real choice but to find that the appellant suffered merely from an nonexculpatory personality or character and behavior disorder.

### A. The "McDonald" Instruction

■ The appellant contends that the refusal of the military judge to incorporate the *McDonald* definition in his instructions left the court members without adequate guidance. *See McDonald v. United States*, 312 F.2d 847 (D.C.Cir.1962) (en banc). We disagree.

The *McDonald* instruction defines a "mental disease or defect" as "any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." *Id.* at 851.

The lack of precise legal definitions for the terms "mental disease or defect" has troubled appellate courts for some time. *See generally United States v. Cortes-Crespo*, 9 M.J. 717, 725 (A.C.M.R.1980), *aff'd*, 13 M.J. 420 (C.M.A.1982); *United States v. Chapman*, 5 M.J. 901, 902–03 (A.C.M.R.1977) (Jones, S.J., concurring), *pet. denied*, 6 M.J. 290 (C.M.A.1979). The Court of Military Appeals recently concluded, after exhaustive study, that "we can no better define the terms 'mental disease or defect' than by use of the terms themselves." *United States v. Cortes-Crespo*, 13 M.J. at 422. We will not require a trial judge to do what the Court of Military Appeals has stated they cannot do, especially in view of that Court's admonition that "attempts at further definition will be confusing rather than clarifying." *Id; see Government of Virgin Islands v. Fredericks*, 578 F.2d 927 (3d Cir. 1978); *United States v. Chandler*, 393 F.2d 920, 926–27 (4th Cir.1968) (en banc). Accordingly, we hold that the military judge did not err by refusing to include the *McDonald* definition in his instructions.[2]

### B. "Personality" Defects

■ The appellant contends that the military judge gave the court members no choice but to reject the insanity defense because of his overly-broad exclusion of personality defects from the definition of a "mental disease or defect." There was considerable disagreement at the trial regarding that portion of the instructions which distinguish mental diseases or defects from other defects. The trial defense counsel requested that the military judge instruct

---

1. This definition was incorporated, effective 1 September 1980, in the Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 120*b* (as amended by Executive Order 12198, 12 March 1980).

2. Although we hold that the *McDonald* instruction was not required in this case and the Court of Military Appeals has stated in *United States*

v. *Cortes-Crespo*, 13 M.J. 420 (C.M.A.1982), that further definition of "mental disease or defect" is unnecessary and may be confusing, we note that the *McDonald* instruction has been incorporated into the Department of the Army Pamphlet 27–9, Military Judges' Benchbook (1 May 1982), paragraph 6–4.

that, "The key word here is mental, as opposed to any other type of defect, such as a defect of morals, character, behavior, development, or culture." The trial defense counsel also requested that the military judge instruct that a personality disorder can rise to the level of a mental disease or defect. On the other hand, the trial counsel requested that the instructions include the word "personality," so that the descriptive examples would read, "such as a defect of morals, *personality,* character, behavior, development, or culture." (Emphasis added.) The trial counsel objected to any instruction permitting the court members to conclude that a personality disorder was a mental defect.

The military judge instructed the court as follows:

> The terms "mental disease or defect" comprehend those irrational states of mind which are the result of deterioration, destruction, malfunction, or nonexistence of the mental, as distinguished from the moral, faculties. The key word here is "mental," as opposed to any other type of defect, such as a defect or [sic] morals, personality, character or personality [sic] resulting from inadequate or improper training and development, lack of moral restraint, or a personal, social, or cultural standard of conduct which differs from that of society as a whole . . . .

The appellant contends that insertion of the word "personality" into the sentence distinguishing mental defects from other defects virtually directed the court members to find that the appellant's "avoidant personality disorder" was not a mental disease or defect, simply because "personality" was part of the nomenclature of the diagnosis.

We disagree. Contrary to the appellant's assertion, the military judge did not exclude all personality defects from the definition of "mental disease or defect." He excluded only those personality defects "resulting from inadequate or improper training and development, lack of moral restraint, or a personal, social, or cultural standard of conduct which differs from a society as a whole." Such an exclusion is consistent

with the *Frederick* standard, which excludes "an abnormality manifested only by repeated criminal or otherwise antisocial conduct." *United States v. Frederick,* 3 M.J. at 234; *United States v. Cortes-Crespo,* 13 M.J. at 422.

The military judge made it clear to the court members that they were not bound by the medical definition of a mental disease or defect. We are satisfied that the instructions insured that the court members would not be misled by labels which use the word "personality," but instead would look to the nature of the appellant's psychiatric disorder. His instructions squarely placed before the court members the burden of determining whether the avoidant personality disorder suffered by the appellant constituted a mental disease or defect in the legal sense. We believe that the military judge's instructions comport with the standards set by the Court of Military Appeals in *United States v. Cortes-Crespo, supra,* and that they are consistent with the purpose enunciated in *Frederick* to "lessen the influence of the experts on the nonmedical components of mental responsibility." *United States v. Frederick,* 3 M.J. at 237.

This case, well tried by both sides, is an example of the proper interplay of medical and legal considerations contemplated in *Frederick.* The medical experts explained their medical diagnosis, defined their medical terms, and described the factual basis for their opinions. Then the military judge explained the law regarding mental responsibility and squarely presented the court members with the task of deciding whether the medical diagnosis of avoidant personality disorder constituted a legal "mental disease or defect." We hold that the military judge's instructions in this case were correct.

## IV

### Sufficiency of the Evidence of Sanity

■ The appellant contends that the evidence is insufficient to establish that he was sane at the time of the offenses. We find his contention without merit.

In this case there is no doubt that the appellant suffers from an avoidant person-

ality disorder, but that under normal circumstances it does not deprive him of mental responsibility for his acts or even make him unfit for military duty. Whether the appellant's avoidant personality disorder constitutes a mental disease or defect is a question of fact which was properly submitted to the court members. *See United States v. Gilliss,* 645 F.2d 1269, 1281 (8th Cir.1981); *Government of Virgin Islands v. Fredericks,* 578 F.2d at 932. Whether the court members decided that the appellant's psychiatric disorder constituted a mental disease or defect cannot be ascertained from their findings. However, we need not reach that question in this case. Even if the court members found that the disorder is a mental disease or defect, they then would have had to decide whether the disorder deprived the appellant of substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Dr. Chalemian concluded that the appellant was not deprived of his capacity to appreciate the criminality of his conduct, but that he was deprived of the substantial capacity to conform his conduct to the requirements of the law. However, Dr. Chalemian's conclusion was premised on an assumption that the appellant's stepson died at the hands of someone other than the appellant. By convicting the appellant of murdering his stepson, the court members rejected the major premise on which Dr. Chalemian's conclusion was based.

We are satisfied beyond a reasonable doubt that the appellant murdered his stepson. Accordingly, we are satisfied that the premise upon which the psychiatrist's conclusions is based did not occur. We find that the evidence is sufficient to satisfy us that the appellant killed both his wife and his stepson, and that the appellant was mentally responsible at the time of the offenses. Lastly, we are satisfied that the sentence is appropriate.

The findings of guilty and the sentence are AFFIRMED.

Senior Judge O'DONNELL and Judge BADAMI concur.