UNITED STATES, Appellee,

v.

Private First Class Todd A. DOCK, 218–94–5662, United States Army, Appellant.

ACMR 0446898.

U.S. Army Court of Military Review.

31 July 1992.

For Appellant: David M. Lewis, Jr. and Captain Holly K. Desmarais, JAGC (argued).

For Appellee: Captain Robert J. Walters, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Major Thomas E. Booth, JAGC, Major Joseph C. Swetnam, JAGC (on brief), Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC.

Before JOHNSON, WERNER and GRAVELLE, Appellate Military Judges.

## OPINION OF THE COURT ON FURTHER REVIEW

WERNER, Judge:

The appellant was convicted, contrary to his pleas, by a general court-martial composed of officer members, of premeditated murder and felony murder while perpetrating a robbery, in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 (1982) [hereinafter UCMJ].[1] He was sentenced to a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, and reduction to the grade of Private E1. The convening authority approved the sentence as adjudged.

### I.

In this appeal, the appellant has assigned the following errors:

THE GOVERNMENT FAILED TO ESTABLISH THE APPELLANT'S MENTAL RESPONSIBILITY AS A MATTER OF FACT BEYOND A REASONABLE DOUBT.

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING DEFENSE COUNSEL'S MOTION TO SUPPRESS STATEMENTS TAKEN FROM APPELLANT IN VIOLATION OF HIS FIFTH AMENDMENT RIGHT TO COUNSEL.

THE MILITARY JUDGE COMMITTED REVERSIBLE ERROR BY BECOMING AN ADVOCATE FOR THE GOVERNMENT IN POSING PROSECUTION–ORIENTED QUESTIONS TO WITNESSES.

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT IN DENYING THE CHALLENGE FOR CAUSE AGAINST COLONEL MICHITSCH.

FELONY MURDER IS MULTIPLICIOUS FOR FINDINGS WITH PREMEDITATED MURDER.

THE SENTENCE IS EXCESSIVE AS TO CONFINEMENT AND INCORRECT IN LAW AND FACT AS TO FORFEITURES.

### II. Facts

There is overwhelming, undisputed evidence proving that on the morning of 12 June 1984, the appellant, Private First Class (PFC) Todd A. Dock entered the taxicab of Claus Engelhardt and stabbed him to death as he robbed him on a highway near Giessen, Germany.

---

1. In 1984, the appellant was first tried by general court-martial for premeditated and felony murder and robbery. Upon mixed pleas, he was found guilty of all charges and specifications and sentenced to the maximum punishment, including death. The convening authori-

ty approved the sentence but this court, *en banc,* set aside the findings and sentence and authorized a rehearing. *United States v. Dock,* 26 M.J. 620 (A.C.M.R.1988), *aff'd,* 28 M.J. 117 (C.M.A.1989).

The appellant spent the evening of 11–12 June 1984 in his barracks on Ayers Caserne watching videotapes and sharing a pizza and three bottles of wine with his roommate, Specialist (SPC) Korpash. At about 0200 hours, the appellant, who had become somewhat intoxicated, brandished a six-inch long knife and began slicing the pages of a comic book. He announced that he was going to "get a RAD" to avenge the death of his father.[2] He also told Korpash he wanted to rob a taxi driver because he needed money and asked him to accompany him in the venture. In describing how he intended to commit the crime, the appellant said that he would hold the knife to the driver's throat while he was driving and make him pull over before relieving him of his money. When Korpash expressed skepticism about the chances for success of the plan, the appellant said he would cut the driver's throat if he failed to comply with his instructions. When Korpash declined to participate in the venture, the appellant menaced him with the knife and warned him not to inform anyone of his intentions. The appellant then hid the knife on his person, stated he was going to get some gloves, and went to the guard house near the main gate of the Caserne where the appellant sometimes served as a gate guard. While there, he obtained a pair of white gloves from a desk which he claimed belonged to him. One of the guards, Sergeant Rivas, testified that the appellant said he wanted to become a member of his shift, that he displayed a knife to him, that he smelled of alcohol, and that he appeared rational and in control of his faculties. The appellant then got up, said that he had to "take care of some business," and left the guard house.

At about 0300 hours, the appellant departed the Caserne and entered Claus Engelhardt's taxi which was waiting at a taxi stand near the main gate. He initially directed Engelhardt to drive to a service club in Kirchgoens but then redirected him to drive to a club in Giessen. On the way, the appellant held the knife to Englehardt's neck and ordered him to stop the taxi. Engelhardt refused to do so and began fighting with the appellant. During the ensuing struggle, the appellant attempted to stab Engelhardt, causing him to lose control of the taxi. The taxi swerved from the highway, first hitting the right guardrail, then ricocheted across the road hitting the center guardrail before stopping. The appellant then overpowered Engelhardt and stabbed him in the neck until he lost consciousness. As he dragged the wounded Engelhardt from the taxi, the latter grabbed the appellant's arm. The appellant repeatedly stabbed him in the abdomen and chest, again rendering him unconsciousness. The appellant then searched the taxi, eventually finding and taking Engelhardt's wallet containing his money, driver's licenses, and personal documents.

Unable to start the vehicle, the appellant began running down the highway in the opposite direction from Giessen. He sequentially threw the blood-spattered knife, its sheath, the gloves, and Engelhardt's empty wallet down an adjoining embankment into the bushes and woods. As he abortively attempted to hitchhike to Ayers Caserne, he was observed by a passing German police car. Either at the appellant's request or without his objection, two German policemen gave him a ride, seating him in the rear of the vehicle. Initially, the police did not suspect the appellant of committing any offense, having given him the ride so he would not have to walk upon the highway. However, after receiving and investigating a radio report about Engelhardt's seemingly abandoned taxi, discovering Engelhardt's corpse, and observing the appellant's bloodstained hands and clothes, they apprehended the appellant for the killing. Their suspicions were triggered when they noticed that the appellant appeared to become nervous when they reversed direction and approached the crime scene; and when he attempted to climb out of the police car stating that he wanted to walk

2. The record reflects that the term "RAD" is slang for "comrade" and is commonly used by American military personnel when referring to Germans. There was nothing in the record to explain appellant's attribution of his father's death to a German.

back to Ayers Caserne, a distance of ten kilometers.

The appellant was taken to a German police station where he was photographed, and his clothes and samples of his hair, fingernails, and bodily fluids were taken for analysis. A blood-alcohol test determined that the appellant's blood, taken at about 0450 hours, contained 1.65 milligrams of alcohol per milliliter of blood. This would have indicated a blood-alcohol level of about 2.00 at the time the killing occurred. Despite his intoxication, the appellant was able to speak clearly and walk normally. He was able to undress himself without losing his balance even though he was handcuffed. During questioning by the German police, the appellant denied killing Engelhardt with a knife. At one point, he spontaneously exclaimed, "Boom, Boom, I killed him." At another point, he requested an American lawyer and asked if he could get one from the United States. The interrogator was of the opinion that at times the appellant appeared to fake being asleep and being intoxicated.

Later that morning, the appellant made a detailed confession to Special Agent Bowen, an Army criminal investigator. Initially, the appellant stated that "he had taken a taxi to Giessen while intoxicated, and two black guys had gotten into the taxi, and they were the ones that had committed the offense." However, after being confronted with contradictory information, he confessed to robbing and killing Engelhardt. The following day, he made another statement to Agent Bowen in which he reaffirmed and clarified his earlier confession.

Engelhardt's driver's licenses, personal documents, and money were subsequently discovered under a mat beneath the front passenger seat of the German police car in which the appellant had been riding. The police also found the appellant's knife, sheath, and gloves, and Engelhardt's wallet near the highway where the appellant said he had thrown them. An autopsy attributed Engelhardt's death to massive loss of blood from multiple stab wounds. Blood and fibers on the appellant's clothing matched Engelhardt's blood and fibers from his sweater.

### III. Mental Responsibility

■ The appellant challenges the factual sufficiency of the court-martial's finding that he was mentally responsible at the time he committed the offenses.[3] He submits that *de novo* appellate review of the conflicting expert and lay evidence pertaining to the appellant's mental state is particularly appropriate in this case. He asserts that the accuracy of the court-martial's determination was less dependent upon the demeanor of the witnesses than the evaluation and resolution of the substance of their lengthy, conflicting, and complex testimony.[4] He argues that the evidence

---

3. The appellant has not contended that the evidence establishing that he was mentally responsible is legally insufficient. The standard for legal sufficiency is whether *"after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Hart,* 25 M.J. 143, 146 (C.M.A.1987) (quoting *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Our statutory mandate requires that we review the proceedings for legal sufficiency nonetheless. Using the aforementioned criterion, we are satisfied the evidence was legally sufficient beyond a reasonable doubt.

4. In his brief the appellant states that he "accepts that all the expert witnesses were truthful," but that "[i]t is not clear that any were entirely correct or entirely misguided or wrongheaded." The appellant seems to be arguing that as there is no evidence to indicate that the

expert witnesses were inclined to lie, their appearance and demeanor on the stand are irrelevant to the accuracy of the court's finding of guilt as a matter of fact. We disagree with the appellant's analysis of the manner in which court members evaluate testimony from experts or any other witnesses.

> There are three situations in which the triers of fact may reject a witness' testimony as unbelievable. First, when the testimony is internally inconsistent or improbable. Second, when it is contradicted by other evidence which is more believable. Third, when the witness is shown to have a bad character for truthfulness.

*United States v. Morrissey,* 14 M.J. 746, 749 (A.C.M.R.1982). Contrary to the appellant's argument, we believe that witness demeanor plays a significant role in the court's credibility determination in each of these situations. Accordingly, where the trial court's credibility determi-

should persuade us to arrive at a different factual conclusion than that of the court-martial and that we should exercise our fact-finding power to set aside the court's determination that the appellant was mentally responsible at the time he committed the offenses. After careful examination of the evidence, we decline to take such action.

The appellant correctly points out that we have statutory authority to overturn a court-martial's finding of guilty on factual grounds. Under the provisions of Article 66(c), UCMJ, 10 U.S.C. § 866(c), we can "weigh the evidence, [judge the credibility of witnesses,] and determine controverted questions of fact differently from the court-martial." *United States v. Sikorski*, 45 C.M.R. 119, 122 (C.M.A.1972). A court of military review's power to overturn a lower court's findings of fact is constrained by language in the statute admonishing it to "recognize that the trial court saw and heard the witnesses."

> [W]here those findings do not depend on the court's observation of the witnesses, our independence as a fact-finder should only be constrained by the evidence of record and the logical inferences emanating therefrom. The Court of Military Appeals has held:
>
> > For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilty beyond a reasonable doubt.
>
> *United States v. Turner*, 25 M.J. 324, 324 (C.M.A.1987); *accord United States v. Cooper*, 28 M.J. 810 (A.C.M.R.1989).

*United States v. Johnson*, 30 M.J. 930, 934 (A.C.M.R.1990).

■ In exercising this power, we are bound by the law in effect on 12 June 1984, the date the appellant committed the of-

fenses rather than the law in effect at the time of the appellant's retrial.[5] Hence, even though the retrial postdated the effective date of amendments to the UCMJ and MCM, the court-martial was properly instructed by the military judge to determine whether the appellant was mentally responsible for his acts in accordance with the standards set forth in *United States v. Frederick*, 3 M.J. 230 (C.M.A.1977). *United States v. Lilly*, 34 M.J. 670 (A.C.M.R. 1992); *see also United States v. Cortes–Crespo*, 13 M.J. 420 (C.M.A.1982); Manual for Courts–Martial, United States, 1969 (Rev. ed.), para. 120b. Those standards provided:

> (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
>
> (2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

*Frederick*, 3 M.J. at 234.

■ Furthermore, prior to enactment of Article 50a, UCMJ, 10 U.S.C. § 850a, the burden of proof was on the prosecution to demonstrate that the accused was mentally responsible beyond a reasonable doubt. Had the appellant committed the offenses subsequent to enactment of Article 50a, he would have had the burden of proving lack of mental responsibility by clear and convincing evidence. *Lilly*, 34 M.J. at 676. We hold that the prosecution met its burden of proving that the appellant was mentally responsible when he committed the offenses.

Essentially, the appellant argues, as he did at trial, that the government failed to sufficiently rebut psychiatric and neurological evidence from various expert witnesses

---

nations are affected by the demeanor of witnesses, we will defer to them.

**5.** That date preceded the implementation of Article 50a, UCMJ, which significantly altered the standards for determining mental responsibili-

ty. *See also* Manual for Courts–Martial, United States, 1984, [hereinafter MCM 1984], Rule for Courts–Martial 916(k) [hereinafter R.C.M.], as changed by Change 3, MCM, 1984, March 3, 1987.

tending to establish that he was not mentally responsible. He also points to lay testimony from his roommate, SPC Korpash, the apprehending German police officers, and German witnesses at the scene of the crimes, indicating that, before and after the commission of the offenses, the appellant was acting in an aberrant manner and "appeared crazy." Finally, the appellant's mother testified that he had sustained head injuries during the period 1982–83.

The appellant cites expert medical testimony from several doctors who were of the opinion that he suffered from a mental disease or defect that adversely affected his capacity to appreciate the criminality of his conduct or his ability to conform his conduct to the requirements of law. Doctor (Dr.) Dauner, a Professor of Neuropsychiatry, first evaluated the appellant in July 1984 and then reviewed subsequently administered psychological tests conducted by a Dr. Wise. She found that, "together with the brain organic damage, the personality disorder that we have found and the influence of alcohol, he was considerably limited in controlling his behavior." Doctor Dauner also stated, "I cannot exclude that he had a mental disease or defect," and implied that the appellant's symptoms suggested "borderline" paranoia which was likely exacerbated by some, unspecified, organic defect of the brain.

On cross-examination, Dr. Dauner admitted that in her initial evaluation report of the appellant in 1984, she had concluded that neurological tests revealed no evidence of organic brain damage or epilepsy. She also indicated that the appellant was uncooperative during the interviews with her. She observed that he refused to answer pertinent questions about the events surrounding the killing of Claus Engelhardt, objected to being interrupted when discussing his family history, and expressed resentment and distrust of her because she was German. Doctor Dauner concluded that the appellant was highly intelligent, had excellent reasoning ability, and understood that his actions were prohibited by law.

Doctor McMurdo, a neuroradiologist, examined computerized tomography (CT) scans and magnetic resonance images (MRI's) of the appellant's brain taken between November 1985 and May 1986. He concluded that the ventricular system in the appellant's brain was abnormally enlarged and that the abnormality may have been caused by illness or trauma. Occasionally, the abnormality causes a condition known as hydrocephalus which causes pressure on certain areas of the brain. He could not determine whether the appellant had suffered from that condition on the evening of the crimes. However, his examination indicated that the condition, if it ever existed, had been arrested and was stable during the period of his evaluation. During cross-examination, Dr. McMurdo admitted that he could not determine whether the appellant's condition could have induced him to commit the offenses.

Doctor Healey, a neurologist and psychiatrist, testified that he evaluated the appellant in the summer of 1987 and was of the opinion the appellant had a "combination of disease processes." He agreed with Dr. McMurdo that the appellant's ventricles were abnormally enlarged and may have contributed to hydrocephalus on the frontal lobes of his brain. He believed this could have affected the brain's mechanism for inhibiting aggressive behavior especially if the appellant had consumed alcohol. He also determined that the appellant was suffering from a variant of pathological alcoholism and clinical depression. Collectively, these conditions may have caused the appellant to feel rage and behave aggressively towards other individuals. In short, his killing of Engelhardt was probably the result of an "irresistible impulse" caused by hydrocephalus, depression, and alcoholism.

On cross-examination, Dr. Healey admitted that he had previously evaluated the appellant in July 1984 and had prepared a memorandum for a sanity board conducted at that time. The memorandum indicated that the appellant had "low pressure hydrocephalus, which is currently compensated;" and that he might have had "diminished capacity to exercise rational judgment."

He explained that he revised his initial diagnosis after reviewing additional medical literature, the appellant's medical history, and consulting with other doctors.[6] He also disagreed with Dr. Wise's diagnosis that the appellant suffered from epilepsy.

Doctor Wise, also a neurologist and psychiatrist, testified that she examined the appellant in 1987. She believed that the appellant suffered from several disorders: "ventricularmegaly dilated ventricles, ... complex partial seizure disorder, and ... alcohol and drug addiction." She diagnosed the seizure disorder as "temporal lobe epilepsy or petit mal epilepsy" during which "the person absences himself even though they're physically in the room." Included among the symptoms of this form of epilepsy are blackouts, headaches, and memory lapses. Although the individual suffering from this condition may appear to be behaving in a rational manner, in fact he may be responding automatously to certain negative stimuli. Doctor Wise believed that, on the evening of 11–12 June 1984, the appellant probably was acting automatously and uncontrollably as a result of his organic and psychological disorders. She concluded that he did not have the capacity to appreciate the criminality of his conduct or the ability to control his conduct.

On cross-examination, Dr. Wise admitted that she had not consulted a neurologist nor had she read the appellant's neurological tests in forming her opinion. She also admitted that her medical specialty was alcohol and drug dependency, not epilepsy. She also admitted she was not fully aware of important aspects of the appellant's medical history that might have had some bearing on her diagnosis. She admitted that amnesia was a symptom of temporal lobe epilepsy but could not reconcile that diagnosis with the appellant's ability to render a detailed statement to criminal investigators immediately after the commission of the offenses. Finally, she could not explain her theory of uncontrolled or automatic behavior in light of the time lag between the initial and subsequent stabbing of Engelhardt.

Doctor Epp, a psychiatrist, testified that he had treated the appellant for a period of eighteen months. He diagnosed the appellant as suffering from "single-option, non-perspective thinking," a condition similar to that described by Dr. Healey as an "irresistible impulse." He believed that the appellant may have developed this condition as a result of a brain disorder, adverse social environment as a child, and alcoholism. He concluded that the appellant's aggressive behavior and anger towards others indicated he could neither appreciate the criminality of, nor control, his conduct. On cross-examination, when presented with a hypothetical question describing the appellant's actions on the evening of 11–12 June 1984, he admitted that the appellant's behavior appeared to be controlled. In particular, after examining the photographs of Engelhardt's corpse, he opined that the wounds did not appear to be indiscriminately placed.

The prosecution argued that the evidence established that the appellant's actions before, during, and after the commission of

---

**6.** When asked by the prosecutor to explain the basis for his revised opinion, Dr. Healey stated:

The factors that I used to come up with my opinion were—all the information that was relevant was present and I was able to extract from the medical record taking his history and doing a neurologic exam at the time I examined him. As far as—as I looked at the literature—at that time I leaned towards the statements I just made. I don't think there is anything that I said at that time that had not occurred to me and was not in my thought process as I analyzed the case. As I looked through the literature and begin [sic] to get every abstract I could find on neurology and violence and pathological intoxication, on epi-sodic discontrol, on aggression, and the neuroanatomy of violence, I became more and more convinced that my opinion at that time was correct, and that's why today I feel much more strongly now that I have this type of information from the leading experts, Dr. Elliot, various people, that back me up on this. At that time there was a disagreement as to—between me and the other people. I felt like these other people had been involved in this type of thing more and I needed to—even though I had reviewed some literature before I saw him, I spent extra effort and time to make sure I understood this so I could give an even more informed opinion.

the offenses demonstrated that he deliberately planned the robbery of a German taxicab driver with a view toward killing the individual if he resisted. The appellant's confession dovetailed with the testimony of SPC Korpash and SGT Rivas in establishing his formulation of the crimes several hours prior to their commission. Moreover, the stab wounds to Claus Engelhardt's body indicated that the appellant's actions were purposeful and controlled. Further, immediately after the killing, the appellant's actions in disposing of and concealing the incriminating evidence reflected logical and rational thought processes. Finally, his confessions were sufficiently detailed to evidence that the appellant was not suffering from amnesia, epilepsy or other brain disorder as had been attested to by some of the defense's expert witnesses.

Among the prosecution's expert medical witnesses, Dr. Jordan, a clinical psychologist and neuropsychologist, testified that she had examined the appellant in 1987 and had reviewed his medical records. She was of the opinion that the appellant had enlarged ventricles but that he did not suffer from organic brain damage or epilepsy. She disagreed with the opinions of both Drs. Dauner and Wise and attacked the validity of the psychological theories upon which they were based. She believed the appellant's actions were caused by an antisocial personality.

Doctor Calkins, a neurologist, evaluated the appellant during December 1985 and July and August 1987, during which period he gave him five electroencephalograms (EEG's). Two of these tests were conducted after the appellant had been intoxicated with alcoholic beverages in order to simulate the physical conditions that allegedly existed on the evening of 11–12 June 1984. None of the EEG's indicated that the appellant's brain was functioning abnormally. Nor did they reveal evidence of brain damage or past or present epileptic seizures. Doctor Calkins expressly disagreed with Dr. Wise's opinion that the appellant was behaving as an automaton when he planned, executed, and attempted to conceal the offenses. He agreed with the neurologists' testimony that the appellant had enlarged ventricles. However, he added that, in the absence of hydrocephalus, the condition, by itself, was not abnormal.

Doctor Golosow, a psychiatrist who sat as president of the sanity board which evaluated the appellant over an eight week period in 1987, was of the opinion that the appellant suffered from an organic brain defect at the time he committed the offenses. Specifically, he felt the appellant suffered from "athrophy in the limbic area, adjacent to the ventricles." He believed the defect was secondary to hydrocephalus which causes increased cerebral pressure and dilation of the ventricles and adjacent areas. The condition may have been aggravated by the appellant's intoxication which made him aggressive. He discounted the fact that various neurological tests had proven negative for organic brain damage. He noted that neurological testing is sometimes incapable of discovering certain types of brain dysfunction. Nevertheless, he concluded that the appellant's neurological defect did not affect his ability to reason or control his behavior. He opined that the appellant was able to premeditate and formulate the intent to kill another individual; did possess the capacity to appreciate the criminality of his conduct; and did have the ability to conform his conduct to the requirements of law.

■ Under military law, resolution of conflicting expert opinions are to be resolved by the triers of fact after evaluating them in the context of the totality of the evidence and after proper instructions by the military judge. *Cortes–Crespo*, 13 M.J. at 422; *United States v. Bardwell*, 16 M.J. 672 (A.C.M.R.1983); *United States v. Walker*, 14 M.J. 824 (A.C.M.R.1982), *pet. denied*, 15 M.J. 397 (C.M.A.1983). The military judge's instructions thoroughly and accurately presented the triers of fact with a clear summary of the expert and lay evidence concerning the appellant's mental responsibility. Their finding of guilt reflects their rejection of the theories proffered by the defense and their acceptance of those of the prosecution on the question of mental responsibility. We have examined

that evidence and conclude that the court was correct in that determination.

We find that the government met its evidentiary burden of disproving that the appellant suffered from a mental disease or defect. There was neurological evidence that the appellant had enlarged cerebral ventricles. However, the medical experts considered this to be an unusual physical characteristic rather than an organic abnormality that could, but not necessarily would, impair the ability of an individual to think rationally and behave in a controlled manner. There is support for the appellant's argument that he may have suffered from dilation or athrophy of the ventricles, epilepsy or some latent organic defect of the cerebral-ventricular system which, along with the consumption of alcohol, may have resulted in hydrocephalus. However, the defense's witnesses were unable to positively state that the neurological defects existed on 11–12 June 1984, or that they affected the appellant's ability to understand the criminality of his actions or his ability to control himself on that date. To the contrary, the neurological evidence (EEG's, CT scans, and MRI's) suggested that the appellant was not suffering from epilepsy, hydrocephalus, or any other organic brain defect and that even if he had such a defect earlier in life, it had been arrested at the time he committed the offenses.

We further find that even if the appellant was suffering from a mental disease or defect, the evidence established beyond a reasonable doubt that he appreciated the criminality of his conduct and was able to conform his conduct to the requirements of law. The testimony of each of the appellant's crucial psychiatric witnesses was weakened by either intrinsic inconsistencies or by successful cross-examination by the government. For example, Dr. Dauner's conclusions were based, in part, on interviews in which the appellant refused to answer potentially incriminating questions about the killing. She also admitted that she did not find the appellant lacked mental responsibility when she first examined him in July 1984. Doctor Healey similarly admitted that he had revised his initial diagnosis in order to conclude that the appellant suffered from an "irresistible impulse." His testimony, moreover, appears halting, uncertain, and unconvincing. *See* footnote 6 herein. Doctor Wise's diagnosis of "temporal lobe epilepsy" and "automatous behavior" was severely flawed by the fact that it was based upon examinations conducted in 1987, did not consider relevant neurological evidence, significant facets of the appellant's medical history, and the apparent absence of typical symptoms such as blackouts and amnesia.

In contrast, the evidence presented by the government's experts was consistent and certain. Likewise, the lay evidence supported the analyses of the government's experts. Accordingly, we are satisfied beyond a reasonable doubt that the appellant was mentally responsible when he committed the offenses.

## IV. Admissibility of Appellant's Pretrial Statements

■ The appellant contends that his statements to Army criminal investigators (CID) on 12 and 13 June 1984 should have been suppressed as they were involuntarily extracted from him during an interrogation initiated by the government in violation of the "bright line" rule of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *United States v. Harris*, 19 M.J. 331 (C.M.A.1985). Those cases hold that where, during a custodial interrogation, an individual suspected of a crime invokes the right to the presence of legal counsel, questioning must cease unless the suspect himself reinitiates the interrogation or until counsel has been made available (*i.e.*, present at the interrogation). *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). We disagree that the appellant's statements should have been suppressed.

The evidence concerning the events that occurred at the German police station after the appellant was apprehended for Claus Engelhardt's murder reveals that, at about 1000 hours, Mr. Von Wiecki, a German, employed by the CID as an investigator and interpreter, arrived at the police sta-

tion where the appellant was being detained to observe his processing and interrogation. He testified that the appellant was alert and sober and acknowledged that he understood that Mr. Von Wiecki worked for the CID when the latter advised him of that fact. At the request of the German police, he explained to the appellant his rights under German law, which included the right to counsel, and asked him if he understood his rights. The appellant replied, "I don't want to make a statement to the German police. I want to make a statement to the CID." This was translated into German, transcribed on a police rights advisement form, and signed by the appellant. The appellant added, "Well, I want to stay with my own folks." During the ensuing interrogation, he asked the German police agent if he could consult with an American lawyer. His request was overheard by two American CID agents, Robinson and Bowen, who were monitoring the interrogation. Subsequently, the German police permitted the CID agents to interview the appellant. After being advised of his rights under American law, the appellant agreed to make a statement without counsel present and confessed to committing the robbery and murder of Engelhardt. The following day, he made another incriminating statement which, with minor changes, corroborated his earlier confession.

We hold that the rule of *Edwards* and *Harris* is inapplicable in the factual context of this case. According to the principles set forth in *United States v. Coleman*, 26 M.J. 451 (C.M.A.1988), *cert. denied*, 488 U.S. 1035, 109 S.Ct. 850, 102 L.Ed.2d 982 (1989), and *United States v. Vidal*, 23 M.J. 319 (C.M.A.1987), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987), a suspect's request for counsel during an interrogation conducted by a foreign police official does not preclude questioning during a subsequent interrogation initiated by American authorities. This "overseas exception" to the *Edwards/Harris* rule applies even where those authorities knew of the suspect's request for counsel to the foreign officials. *Coleman*, 26 M.J. at 453.

■ We also hold that, even if the "overseas exception" to *Edwards/Harris* is inapplicable, the appellant's statements are nevertheless admissible as the record demonstrates that his request for counsel was, at best, ambiguous. Invocation of the right to counsel must be unequivocal and unambiguous. *United States v. Brown*, 27 M.J. 614 (A.C.M.R.1988), *aff'd*, 28 M.J. 232 (C.M.A.), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3217, 106 L.Ed.2d 567 (1989); *see also United States v. McLaren*, 34 M.J. 926 (A.F.C.M.R.1992); *United States v. Schake*, 30 M.J. 314 (C.M.A.1990); *United States v. Whitehead*, 26 M.J. 613, 617 (A.C.M.R.1988). The appellant requested counsel for the sole purpose of dealing with German criminal investigators to whom he had no desire to make a statement. However, he apparently had no objection to answering questions from American investigative authorities and expressed a willingness to talk with them. We are therefore satisfied that the appellant's confessions to the CID, which he made after having been advised of and waiving his rights under American law, were voluntary and were not improperly admitted.

## V. Judicial Impartiality

■ The appellant alleges that the military judge was not impartial because the judge *sua sponte* asked numerous hypothetical questions to the expert witnesses which were improper in form and substance. He specifically alleges that the questions "served to restate the government's theory of the case while omitting evidence favorable to the defense;" "were sprung on the parties without notice;" and "served to summarize continuously the Government evidence before the members." As a result, witnesses changed their testimony and the court members "tuned in" on the judge's appraisal of the evidence pertaining to the issue of mental responsibility to the detriment of the appellant. The government argues that the questions were not improper and were necessary to clarify complicated and conflicting expert testimony. Furthermore, the judge's questions did not cause any witness to alter his or her opinion. We find the

638

appellant's assigned error to be without merit.

In *United States v. Reynolds*, 19 M.J. 529, (A.C.M.R.1984), *aff'd*, 24 M.J. 261 (C.M.A.1987), this court recited the pertinent legal principles for determining judicial bias during trial proceedings. Essentially, they provide a balancing test.

> The test for determining whether a military judge has abandoned his role and become a partisan advocate is a subjective one. The totality of circumstances must be considered. Although the military judge cannot lay aside his impartiality and become an advocate for one side or the other, he can, and sometimes must, ask questions to clear up uncertainties in evidence or further develop the facts.

*Id.* at 533; *accord United States v. Shackelford*, 2 M.J. 17 (C.M.A.1976); *United States v. Wood*, 29 M.J. 1075 (A.C.M.R.), *pet. denied*, 31 M.J. 492 (C.M.A.1990).

■ The Military Rules of Evidence [hereinafter Mil.R.Evid.] counsel trial judges to admit relevant evidence, not admit irrelevant evidence, and exclude relevant evidence where, *inter alia*, it may confuse the issues or mislead the court-members. Mil.R.Evid. 402, 403. Military judges may *sua sponte* call, interrogate, and cross-examine witnesses. Mil.R.Evid. 614. Where the witness is testifying as an expert, hypothetical questions are a proper and often preferred method for accomplishing the examination as it enables the court members to observe and understand the basis for the expert's opinion. *United States v. Celestine*, 510 F.2d 457 (9th Cir. 1975); *Miller v. Pate*, 300 F.2d 414 (7th Cir.), *cert. denied*, 371 U.S. 898, 83 S.Ct. 193, 9 L.Ed.2d 131 (1962). Of course, the questions should be premised on matters in evidence or anticipated to be in evidence. *United States v. Houghton*, 31 C.M.R. 579 (A.F.C.M.R.1961), *aff'd*, 32 C.M.R. 3 (C.M.A.1962).

We do not find the judge's hypothetical questions suggestive of the appellant's guilt or decidedly biased against him. To the contrary, they were necessary to a fair and just result in view of the complicated and extensive expert evidence presented to the court. Medical testimony in general, and psychiatric testimony in particular, is intrinsically esoteric and exceedingly difficult for lay persons to follow. That difficulty was magnified in this case because of the substantial number of expert witnesses, the variety of the theories supportive of their opinions, and the breadth of their conflict. Hypothetical questions that summarize the evidence tend to put the case in perspective and to facilitate the ability of the court-members to understand the bases for the experts' opinion.

We note too, that this court set aside the original findings and sentence on grounds that newly-discovered psychiatric evidence raised a substantial issue that the appellant was not mentally responsible. We permitted a rehearing believing that, because of its complexity, a trial court was better suited to resolve the issue. *Dock*, 26 M.J. at 623–25. To deny the military judge the necessary discretion to have the evidence relevant to the issue fully and clearly presented to the court-members would be inappropriately restrictive.

### VI. Challenge for Cause

■ We also hold that the military judge did not err in denying the appellant's challenge for cause of the president of the court-martial, Colonel (COL) Michitsch.

The appellant's challenge was based, in part, on an admission by COL Michitsch during *voir dire* that he had seen an artist's sketch of the appellant on the back page of the *Stars and Stripes* newspaper that had mentioned the word "retrial." In response to the military judge's questions, COL Michitsch stated he had not drawn any conclusions from the information. The appellant now argues that there was no guarantee that COL Michitsch was free of the taint from knowledge of the appellant's prior trial. He also asserts that as the military judge did not instruct COL Michitsch not to discuss what he had learned with the other court members, there was no assurance that COL Michitsch did not inform the other members of the damaging information, thereby contaminating them.

■ If it appears that the challenged member of a court-martial should not sit "in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality," a challenge for cause should be liberally granted. *United States v. Smart,* 21 M.J. 15 (C.M.A. 1985); R.C.M. 912(f)(1)(N). However, a judge's denial of a challenge for cause should be treated with due deference when based upon the member's disclaimer of being able to remain impartial when such disclaimer is "delivered in a manner indicative of truthfulness;" and where the disclaimer is not contradicted by objective evidence. *United States v. Harris,* 13 M.J. 288, 291 (C.M.A.1982).

■ Colonel Michitsch's averment that he would not be influenced by his knowledge of the appellant's first trial was properly determined to be sincere and credible by the military judge and was not contradicted by any objective evidence. Extra-judicial knowledge of the existence of a previous trial does not *per se* disqualify an otherwise competent court-member from sitting, as that knowledge does not necessarily mean that the appellant was convicted. *See United States v. Jobson,* 31 M.J. 117 (C.M.A.1990). For like reason, we do not find error in the military judge's failure to instruct COL Michitsch not to discuss the sketch with the other court-members.

■ The appellant also has called our attention to the fact that the military judge had previously granted challenges for cause against three other members of the court-martial panel because they had been exposed to information concerning the appellant's previous trial. He argues that the judge should have excused COL Michitsch on the basis of consistency by applying the "law of the case." *See Arizona v. California,* 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). However, the military judge's action in excusing the other court-members was not premised on their exposure to potentially prejudicial information. The judge conducted a *voir dire* of the members and, after ascertaining that they could remain impartial, denied the challenge. At a later session of trial, he announced in open court that he had reconsidered his determination and, as this was a capital case, out of an abundance of caution, he decided to grant the challenges. This was an act of judicial discretion that was not required by law and has no precedential effect. As such, the law of the case doctrine does not apply and does not mandate that the challenge of COL Michitsch also be granted.

## VII. Multiplicity

■ The appellant contends that his convictions of premeditated and felony murder are multiplicious for findings and that dismissal of the latter is an appropriate remedy. *United States v. Hubbard,* 28 M.J. 27 (C.M.A.), *cert. denied,* 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 101 (1989); *United States v. Dodson,* 21 M.J. 237 (C.M.A.), *cert. denied,* 479 U.S. 1006, 107 S.Ct. 644, 93 L.Ed.2d 701 (1986); *United States v. Teeter,* 16 M.J. 68 (C.M.A.1983); *United States v. Mobley,* 28 M.J. 1024, 1034–35 (A.F.C.M.R.1989), *remanded on other grounds,* 31 M.J. 273 (1990). The government agrees that multiplicity exists but importunes us to let stand the appellant's conviction of robbery as it is a lesser included offense of felony murder. We agree with the government. *See United States v. Baker,* 14 M.J. 361, 368 (C.M.A. 1983). Of the elements alleged in the offense of felony murder, only those pertaining to the unlawful killing of another merge into the offense of premeditated murder. MCM, Part IV, para. 43b. The remaining element involving the perpetration of the offense of robbery is separate for findings purposes. We will modify the findings accordingly in our decretal paragraph.

## VIII. Sentence Appropriateness

■ We find the sentence in this case to be appropriate. Private First Class Dock's killing of Claus Engelhardt was a cruel, savage, cowardly, and heartless act perpetrated by an individual with virtually no regard for the sanctity of the life of another human being. Among the matters

in aggravation we have considered is the fact that he meticulously planned and executed this crime under circumstances in which the victim was particularly vulnerable. Moreover, we have considered that there was evidence he was voluntarily intoxicated. However, voluntary intoxication neither excuses nor lessens the brutality of the appellant's actions and does not warrant our lessening his punishment. *See United States v. Morgan*, 33 M.J. 1055 (A.C.M.R.1991).

We have examined the issues raised by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982) and find them to be without merit.

Only so much of the findings of guilty of Specification 2 of the Charge as provides that the appellant did commit a robbery against Claus Engelhardt on or about the date and at the place alleged is affirmed. The remaining findings of guilty and the sentence are affirmed.

Senior Judge JOHNSON and Judge GRAVELLE concur.